(85 P.3d 728)
No. 90,598

JAMES C. NELSON, JR., *Appellee,* v. CAPITAL CITY MOVING AND
STORAGE, and CLAIM INDEMNITY SERVICES, *Appellants.*

Opinion filed March 12, 2004.

*James L. Wisler,* of James L. Wisler Law Offices, of Lawrence, for appellants.

*Mark W. Works*, of Works & Works, of Topeka, for appellee.

Before GREEN, P.J., MARQUARDT and MALONE, JJ.

GREEN, J.: Capital City Moving and Storage (Capital City) and its insurance carrier, Claim Indemnity Services, appeal from the decision of the Workers Compensation Board (Board) awarding permanent total disability compensation to James Nelson. The Board based its compensation award on both work-related injuries and Nelson's preexisting mental condition. Capital City contends that the evidence did not support an award for permanent total disability. Capital City asserts that because there is no causal connection between Nelson's preexisting mental condition and his work-related injuries, the condition is not compensable. We find that under K.S.A. 44-510c(a)(2), a mental condition is compensable only if it is causally connected to a work-related physical injury sustained by the claimant.

Nevertheless, Nelson argues that his preexisting mental condition is not a bar to permanent total disability under the odd-lot doctrine. This jurisdiction has been silent about whether we wish to adopt this doctrine. Even if we were to apply the odd-lot doctrine, however, Nelson fails to meet the test for permanent total disability. Therefore, we reverse the Board's decision to award permanent total disability compensation and remand for an award under the permanent partial disability statute.

*Facts*

Nelson worked at Capital City for approximately 20 years performing such duties as driving trucks, moving furniture, packing and carrying freight, and loading and unloading trucks. In the course of his employment with Capital City, Nelson sustained several injuries to his back, neck, and shoulders, with his most recent injuries incurred during March 2001.

After this accident, Dr. Chris Fevurly placed Nelson on restricted work duties. Based on these restrictions, Capital City had enough work for Nelson only on a part-time basis. Although it is unclear from the record the amount of hours that Nelson worked under this arrangement, Nelson testified that he worked an average

of 4-6 hours per week. During December 2001, Katherine Fischer, owner of Capital City, terminated Nelson for failure to contact the office for 2 weeks. At the regular hearing, Nelson testified that he called Capital City every day and that Fischer eventually told him that she would contact him when he was needed to work.

Nelson testified that after he was terminated from Capital City he searched for available jobs at the job service center. He stated that the available jobs were beyond his qualifications and that he would need to have vocational training. Nelson also testified that he made two oral inquiries for employment at Dillon's and at Capital City Cab. He was not working at the time of the hearing.

The evidence introduced at the regular hearing indicated that Nelson was functioning at a low intellectual level. In particular, Nelson testified that he graduated from high school in special education classes. He further testified that his reading and writing skills were limited. The parties stipulated to a report by Dr. Melvin Berg which stated that Nelson was in the borderline range of intellectual ability and that his abilities were extremely limited. The report noted that Nelson's efforts at performing tasks could deteriorate quickly as he becomes anxious, dismayed, and humiliated. Dr. Berg's report concluded that Nelson was "only capable of performing the most simple and routine tasks, which involve limited problem solving."

In addition to Dr. Berg's report, three other reports from medical doctors who examined Nelson, Dr. Fevurly, Dr. Peter Bieri, and Dr. Daniel Downs, were admitted into evidence. These reports only evaluated Nelson's physical injuries and, therefore, made no conclusions pertaining to his mental condition.

Dr. Fevurly, who was Nelson's treating physician, diagnosed Nelson with a left shoulder rotator cuff tear and neck and back injuries. He determined that Nelson had reached maximum medical improvement and that he suffered a 16% whole person impairment. Fevurly further testified that Nelson could perform 8 of the 9 central job tasks that he had performed in the last 15 years. This translated to an 11% task loss. Fevurly restricted Nelson's lifting so that he could occasionally lift 30-40 pounds, frequently lift 20-30 pounds, and repetitively lift up to 10 pounds. In addition,

Dr. Fevurly indicated that Nelson would be unlikely to tolerate prolonged overhead work or lifting with his left arm and would need to avoid prolonged or nonstop bending and stooping. He also recommended that Nelson be allowed to alternate between sitting and standing as needed for pain control.

When asked about Dr. Berg's report, Fevurly testified that his assessment of Nelson's cognitive circumstances was consistent with that of Dr. Berg but that he did not completely agree that Nelson was unemployable. Fevurly stated that Nelson could still do some light to medium level work as compared to sedentary and cognitive skill work.

Similar to Dr. Fevurly's restrictions, Dr. Bieri recommended that Nelson avoid frequent bending, stooping, reaching, and handling. He limited Nelson's lifting to occasional lifting of 20 pounds, frequent lifting of 10 pounds, and "negligible constant lifting." Dr. Bieri testified that Nelson suffered a 22% whole person impairment and placed him in the light physical demand level. In addition to the back, neck, and shoulder injuries, Dr. Bieri diagnosed Nelson with entrapment neuropathy. Dr. Bieri also found that Nelson was unable to perform four out of the nine essential tasks and, therefore, rated his task loss at 44%. Dr. Bieri, however, did not rate and made no conclusions on Nelson's mental disability.

Dr. Downs, the court-appointed medical examiner, did not testify but his report indicated that Nelson suffered from cervical myofacial strain. He disagreed with the diagnosis of carpal tunnel syndrome. Dr. Downs indicated that he also disagreed with Nelson's diagnosis of left shoulder rotator cuff tear but would be willing to amend his report after he saw the studies for this injury. Dr. Downs gave Nelson a 5% functional impairment rating and restricted Nelson's lifting to occasional lifting of up to 40 pounds and frequent lifting of up to 20 pounds. Dr. Downs also found that Nelson could perform all of his central job tasks except loading and unloading the truck.

Additional evidence relating to Nelson's intellectual abilities came from Bud Langston, the vocational rehabilitation consultant. Langston submitted two reports and also testified during the hearing. His first report concluded that although Nelson's work duties

were restricted, Nelson could maintain his employment. After learning that Nelson had been terminated from Capital City and after reviewing reports from Dr. Fevurly and Dr. Berg, Langston issued a second report. Based upon Nelson's mental disabilities and his physical restrictions, Langston opined that Nelson was going to be an unsuccessful employment placement to any setting where he could earn wages. He concluded:

"His vocation prognosis is very guarded and unless there is either an improvement in his physical condition or he's able to concentrate, retain new learned procedures, and control his anxiety and frustration, Mr. Nelson could be permanently and totally unable to engage in any occupation currently described in the national economy."

Capital City objected during the testimony of Langston and Dr. Bieri to any reference to Dr. Berg's report as hearsay testimony.

After considering Nelson's physical injuries and mental limitations, the ALJ concluded that Nelson was permanently and physically disabled. Capital City appealed the ALJ's decision to the board. In a 2-1 decision, the Board affirmed the ALJ's ruling and concluded:

"Placing greater weight on the opinions given by the treating physician, Dr. Fevurly, and by claimant's vocational expert, Mr. Langston, the Board finds claimant to be permanently and totally disabled due to the combination of his work-related injuries and his preexisting mental condition. Once claimant's work-related injuries resulted in his being given permanent restrictions, his available labor market dwindled to almost nothing. Taking into consideration his education, experience and capacity for retraining, claimant is realistically unemployable."

The dissenting Board member determined that Nelson was not permanently and totally disabled and stated:

"The liberal finding by the majority in this opinion is contradicted by the evidence. It does not fit the statutory definition of K.S.A. 44-510c and comes no where near the permanent total standard set in *Wardlow* [v. *ANR Freight Systems*, 19 Kan. App. 2d 110, 872 P.2d 299 (1993)]."

The Board member concluded that Nelson should be awarded workers compensation for a permanent partial disability using the task loss opinions of the medical doctors and an imputed wage.

*Preexisting Mental Condition*

Capital City argues that the medical evidence and expert testimony in this case do not support a finding of permanent total disability. Capital City contends that under workers compensation law preexisting conditions are not compensable unless the condition is causally connected to the work-related injuries. The Board based Nelson's award on both physical injuries and a preexisting mental condition. Capital City argues that Nelson's preexisting mental condition was not compensable because there was no causal connection between his physical injuries and his mental condition.

On the other hand, Nelson argues that the Board's ruling was correct and supported by the evidence. Nelson contends that the facts of his case are quite similar to those in *Wardlow v. ANR Freight Systems*, 19 Kan. App. 2d 110, 872 P.2d 299 (1993), in which this court affirmed the Board's award of permanent total disability compensation. In addition, Nelson cites to the odd-lot doctrine as authority for the Board's decision.

The issue raised by Capital City requires us to interpret K.S.A. 44-510c(a)(2) and determine whether it was proper for the Board to base its award in part on Nelson's preexisting mental condition. Issues involving interpretation of statutory provisions are questions of law over which appellate courts have unlimited review. While an appellate court gives deference to the Board's interpretation of the law, if such interpretation is interpreted or applied erroneously, the court may grant relief. *Pruter v. Larned State Hospital*, 271 Kan. 865, 868, 26 P.3d 666 (2001).

K.S.A. 44-510c(a)(2) defines permanent total disability and provides:

"Permanent total disability exists when the employee, on account of the injury, has been rendered completely and permanently incapable of engaging in any type of substantial and gainful employment. Loss of both eyes, both arms, both feet, or both legs, or any combination thereof, in the absence of proof to the contrary, shall constitute a permanent total disability. *Substantially total paralysis, or incurable imbecility or insanity, resulting from injury independent of all other causes, shall constitute permanent total disability. In all other cases permanent total disability shall be determined in accordance with the facts.*" (Emphasis added.)

Under this statute, a worker who has suffered a work-related injury is entitled to permanent total disability benefits only when it is impossible for him or her to engage in any type of substantial and gainful employment. The Board found that Nelson was permanently and totally disabled due to the combination of his physical injuries and his preexisting mental condition. The third sentence of K.S.A. 44-510c(a)(2) directly addresses compensation for mental disorders and requires a causal connection between the mental problem and the work-related injury.

The Board, however, relied on the fourth sentence of K.S.A. 44-510c(a)(2). This is a general provision and does not specifically address compensation for mental conditions. Nevertheless, if the fourth sentence is construed so as to not require a causal link between a mental condition and a work-related injury, the mental condition part of the third sentence would become meaningless. A statute should be read so as to give effect to the whole statute. As a result, no part of the statute is to be treated as surplusage. *KPERS v. Reimer & Koger Assocs, Inc.,* 262 Kan. 635, 643-44, 941 P.2d 1321 (1997).

Moreover, our case law requires a causal link between the mental problem and the injury in order to find it compensable. For example, our Supreme Court in *Hayes v. Garvey Drilling Co.,* 188 Kan. 179, 360 P.2d 889 (1961), determined that a permanent total disability award could be based on a mental condition that was connected to the employee's work-related injuries. In that case, Hayes sustained serious physical injuries in a work-related accident and also suffered from traumatic neurosis. The district court found that Hayes was permanently and totally disabled as the result of his neurosis. Although there was evidence that Hayes was predisposed to traumatic neurosis, the district court concluded that this information was immaterial as the accident was the cause of his nervous symptoms. Our Supreme Court upheld the district court's decision. In finding that Hayes could be compensated for his mental problem, our Supreme Court stated that when a work-related accident aggravates or accelerates an existing disease, the claimant should not be denied compensation merely because of such preexisting condition. 188 Kan. at 184.

This court and our Supreme Court have continued to follow the reasoning in *Hayes* when deciding subsequent cases that involve compensation for a mental condition. In *Boutwell v. Domino's Pizza*, 25 Kan. App. 2d 110, Syl. ¶ 3, 959 P.2d 469 (1998), the claimant was attacked and stabbed in an attempted robbery while he was delivering pizzas at an apartment complex. As a result of the attack, Boutwell sustained physical injuries and also developed posttraumatic stress disorder. Although Boutwell had a preexisting mental disorder, the Board found that the attack had aggravated Boutwell's mental problem and awarded permanent total disability compensation. This court affirmed the award of permanent total disability compensation. We stated that traumatic neurosis is compensable if it results from a covered physical injury and meets the other requirements of the Workers Compensation Act. 25 Kan. App. 2d at 120.

Consistent with this reasoning, our Supreme Court in *Followill v. Emerson Electric Co.*, 234 Kan. 791, 796, 674 P.2d 1050 (1984), determined that claimant's mental disorder was not compensable under the Workers Compensation Act because it did not stem from any physical injuries suffered by the claimant. In that case, the claimant arrived at a machine moments after his coworker's head was crushed in a die cast press. After seeing his coworker's injury, Followill experienced posttraumatic stress disorder. Although the district court awarded compensation to Followill for his mental disorder, our Supreme Court reversed this decision. In finding that Followill's mental problem was not compensable, our Supreme Court stated:

"We hold, in accordance with an unbroken line of worker's compensation cases in this state, that the obligation of an employer under K.S.A. 44-501 *et seq.* does not extend to mental disorders or injuries unless the mental problems stem from an actual physical injury to the claimant. To extend the obligation to include mental disorders, absent physical injury, is a matter for consideration by the legislature." 234 Kan. at 796.

From these cases, we conclude that a mental condition is compensable under the Workers Compensation Act only if it has a causal connection to the claimant's work-related physical injuries. Although these cases involve claimants who suffer from mental

problems which are different in character from those of Nelson, the issue in those cases is similar to the issue here—whether compensation can be awarded for a mental condition. Applying the above reasoning here, we find that under the fourth sentence of K.S.A. 44-510c(a)(2) total disability compensation can be based on Nelson's mental condition only if the condition was causally connected to his physical injuries.

There was no evidence presented to the Board that Nelson's preexisting mental condition was causally connected to his work-related physical injuries. In fact, the evidence indicated that this condition was present throughout his life and posed limitations on other areas of his life as well. For example, Nelson testified that he had attended special education classes in high school and that his reading and writing skills were limited. Nelson also presented reports which revealed that he intellectually functioned at a low level from an early age. Although Langston testified that Nelson's limited abilities restricted his employment prospects, this testimony and the medical testimony did not establish that Nelson's preexisting mental condition was causally connected to his work-related physical injuries.

### Distinguishing Wardlow v. ANR Freight Systems

Nelson points to *Wardlow v. ANR Freight Systems*, 19 Kan. App. 2d 110, as authority for the Board's decision. In that case, Wardlow sustained severe injuries to his back, pelvis, hip, and leg after he was run over by a high-low machine. After Wardlow underwent three surgeries and several months of rehabilitation, he still had internal screws in his pelvic area, had a 10-inch plate and screws attached to his leg, and was provided with a plastic brace to support his foot. One of the doctors testified that Wardlow was essentially unemployable because of his restricted work duties. The independent medical examiner, who was appointed by the trial court, stated that Wardlow was probably not employable by virtue of his age and his reliance on physical labor-type jobs. The evidence revealed that Wardlow was 63 years old and had been employed by the same company for 24½ years at the time of his injury.

The trial court determined that Wardlow was permanently and totally disabled based on the totality of the circumstances. The trial court looked at Wardlow's serious and permanent injuries, the findings of the two medical doctors, the extremely limited physical chores that Wardlow could perform, his age, his lack of training, driving and transportation problems, past history of physical labor jobs, being in constant pain, and constantly having to change body positions. This court determined that there was substantial competent evidence to support the trial court's ruling. 19 Kan. App. 2d at 113-15. We noted that where the examining physicians concluded that Wardlow was essentially unemployable and the vocational experts determined that it would be difficult for Wardlow to obtain any type of employment due to his age and physical restrictions, this provided a substantial basis of fact "from which the trial court could reasonably find the workman was completely and permanently incapable of engaging in any type of substantial and gainful employment under K.S.A. 1992 Supp. 44-510c(a)(2)." 19 Kan. App. 2d 110, Syl. ¶ 5.

We find *Wardlow* to be distinguishable from the case at hand. First, the trial court in *Wardlow* did not award compensation for a preexisting disability. Instead, the trial court considered Wardlow's age and lack of training as only one of the factors in a totality of circumstances analysis. Second, the medical testimony and expert testimony in *Wardlow* supported the permanent total disability award. In fact, one of the examining doctors testified that Wardlow's physical work restrictions rendered him essentially unemployable. Contrastingly, the medical testimony from all of Nelson's examining doctors regarding his physical injuries established that he had the ability to perform some physical work. Dr. Fevurly, whose testimony was relied on by the Board, stated that Nelson could perform some light to medium level physical work as compared to strictly cognitive and sedentary work. Based on these differences, the decision in *Wardlow* does not support the Board's award.

*Odd-Lot Doctrine*

Nelson cites the odd-lot doctrine to establish that his preexisting mental condition is not a bar to permanent total disability under K.S.A. 44-510c(a)(2). In *Lee v. Minneapolis Street Railway Co.*, 230 Minn. 315, 317, 41 N.W.2d 433 (1950), the court in defining an odd-lot employee stated that he must be "so injured that he can perform no services other than those so limited in quality, dependability, or quantity that a reasonably stable market for [him] does not exist." In those jurisdictions that have adopted this doctrine, the extent of the employee's physical impairment along with his or her mental capacity, work experience, education, training, age, and the availability of suitable work must be considered. See 82 Am. Jur. 2d, Workers' Compensation § 381; *Patterson v. Arkansas Dep't. of Health*, 343 Ark. 255, 265, 33 S.W.3d 151 (2000). If, after considering these various factors, it is determined that the employee is an odd-lot employee, he or she is considered totally disabled.

This jurisdiction, however, has been silent about whether we wish to adopt the odd-lot doctrine. Nevertheless, for the sake of argument, let us assume that Kansas would adopt this doctrine. In reviewing disputed issues of fact, our review is limited to determining whether the Board's findings of fact are supported by substantial competent evidence. Substantial evidence possesses something of substance and relevant consequence and carries with it a fitness to induce conviction that the award is proper, or furnishes a substantial basis of fact from which the issue can be reasonably resolved. When reviewing the Board's decision, we do not reweigh the evidence or determine the credibility of witnesses. *Mudd v. Neosho Memorial Regional Med. Center*, 275 Kan. 187, 191-92, 62 P.3d 236 (2003).

Based on the evidence presented to the Board, Nelson has failed to show that he is an odd-lot employee. Even with his physical restrictions and mental limitations, Nelson possessed several marketable skills which could be used to obtain employment. Perhaps Nelson's most important asset was his Commercial Class A driver's license which allowed him to drive heavy vehicles, such as 18-wheel trucks, and vehicles with more than 16 passengers. See K.S.A. 8-234b. Significant to Nelson's ability to use this license, all of the

examining doctors determined that Nelson could still perform the essential job task of driving a truck. In addition, Dr. Bieri, whose testimony was most favorable to Nelson, determined that Nelson could still map a route and check the schedule; inspect a truck's fluid, lights, and brakes; operate a forklift; and clean and pack shoes. Dr. Fevurly, whose testimony was relied upon by the Board, testified that Nelson could also clean the warehouse and check supplies. Furthermore, the medical testimony showed that Nelson had the ability to perform other physical tasks. In particular, Dr. Bieri placed Nelson in the light physical demand level, and Dr. Fevurly stated that Nelson could perform some light to medium level work. As a result, the medical testimony in this case did not establish that Nelson was incapable of engaging in any substantial and gainful employment.

Although Langston concluded in his second report that Nelson was going to be an unsuccessful employment placement, his deposition testimony indicated otherwise. Langston testified that he would go forward with job placement efforts for Nelson. Although his report recommended that Nelson contact the Topeka Association for Retarded Citizens for piecework, Langston testified that he would not limit Nelson's job search to those types of entities. Instead, Langston just suggested that this would be a place to start.

Furthermore, when Langston wrote his second report, he did not have any medical reports which set forth Nelson's permanent limitations. In this second report, Langston stated: "In discussing the assistance that I might provide for Mr. Nelson currently in his job search, I still note a lack of concrete physical limitations by which to guide any such job search." Although Langston received the medical reports before his deposition, he did not evaluate the jobs Nelson might be able to perform. For instance, Langston did not consider the various jobs in which Nelson might be able to use his Commercial Class A driver's license or his ability to operate a forklift. As a result, Langston's reports and testimony did not adequately establish that Nelson was permanently and totally disabled. See *Guyton v. Irving Jensen Co.*, 373 N.W.2d 101, 106 (Iowa 1985) (Under the odd-lot doctrine, a claimant has the burden of

establishing a prima facie case of total disability by producing substantial evidence that he is not employable in the labor market.).

After reviewing the evidence presented to the Board, we determine that there was no substantial competent evidence to find that Nelson was permanently and totally disabled. "Permanent total disability exists when the employee, on account of the injury, . . . [is] incapable of engaging in any type of *substantial* and *gainful* employment." (Emphasis added.) K.S.A. 44-510c(a)(2). This statute requires permanent total disability benefits to be paid to a worker who has suffered a work-related injury only when it is impossible for him or her to engage in any type of substantial and gainful employment. Even with Nelson's physical impairment and his preexisting mental condition, Nelson still retains substantial earning capacity and does not meet the standard of permanent total disability. Because Nelson can earn income after his injury, he should be limited to benefits under the permanent partial disability statute.

Capital City raises several additional arguments that are unnecessary for this court to address. Specifically, Capital City contends that Nelson's injuries do not rise to the level of severity contemplated by K.S.A. 44-510c(a)(2), that physician testimony was necessary to find Nelson suffered a permanent and total disability, and that Dr. Berg's report was not competent evidence which could be used by Langston. Because we have decided that the Board should not have awarded compensation for a permanent total disability, it is unnecessary to address these remaining arguments.

Reversed and remanded.