No. 112,521

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

Donald J. Wimp,
*Appellee*,

v.

American Highway Technology
and
Travelers Property Casualty of America,
*Appellants.*

SYLLABUS BY THE COURT

1.

K.S.A. 44-510c(a)(2) provides the overall rule that an employee is permanently and totally disabled if a work-related injury has left him or her "incapable of engaging in any type of substantial and gainful employment." Restated, when a work injury leaves an employee essentially and realistically unemployable, that employee is permanently and totally disabled.

2.

As it stood before statutory amendments in 2011, K.S.A. 44-510c(a)(2) provided two presumptions. If the worker suffered parallel injuries (such as both feet or both hands), there was a rebuttable presumption of permanent total disability. If the worker suffered substantially total paralysis "or incurable imbecility or insanity" resulting solely from work-related injury, there was an irrebuttable presumption of permanent total disability. In that irrebuttable presumption, the term "incurable imbecility," initially added to our workers-compensation statutes in 1917, referred to a level of intellectual impairment categorized in more recent times as moderate to severe mental retardation, and not to merely below-average intellectual capacity.

3.

On the facts of this case, in which the employee suffered parallel injuries to both arms, the Workers Compensation Board properly applied a rebuttable presumption of permanent total disability.

4.

On the facts of this case, in which the employee had always performed manual labor, had limited ability to do other work, and had limited or no ability to do manual labor after his work injury, substantial evidence supported the Workers Compensation Board's conclusion that his employer did not rebut the statutory presumption of permanent total disability.

Appeal from Workers Compensation Board. Opinion filed October 23, 2015. Affirmed.

*Vincent A. Burnett* and *Travis L. Cook*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, for appellants.

*William L. Phalen* and *Crystal D. Marietta*, of Pittsburg, for appellee.

Before MALONE, C.J., LEBEN, J., and HEBERT, S.J.

LEBEN, J.: This appeal is brought by an employer and its insurance carrier from an order awarding permanent-total-disability compensation to its employee. An employee qualifies for that compensation when an on-the-job injury has left "the employee . . . completely and permanently incapable of engaging in any type of substantial and gainful employment." K.S.A. 44-510c(a)(2).

The employer argues that in this case, its employee's inability to find other work was largely due to his limited intellectual ability and, thus, the employer should not be

2

responsible for his inability to find work. But K.S.A. 44-510c(a)(2) considers the ability of "the employee" who was injured to obtain gainful employment, not the ability of Stephen Hawking or even the ability of the theoretical average person. Substantial evidence supports the Workers Compensation Board's conclusion that the employee in our case, Donald Wimp, was left incapable of engaging in gainful employment due to his on-the-job injuries, and we affirm the award of compensation to him.

FACTUAL AND PROCEDURAL BACKGROUND

Wimp worked for 18 years doing manual labor for American Highway Technology, a company that manufactures concrete bridges and overpasses. Wimp's job was to run wire through a machine that transformed it into smaller widths for use throughout American Highway Technology's plant. In doing this work, Wimp used his hands to bend the wire, to guide it through the machine, to hook clamps onto it, and to counteract significant pressure exerted by the roll of wire as it was being fed into the machine.

After he experienced pain, numbness, and a tingling sensation in his hands, neck, and shoulder, Wimp had right and left carpal-tunnel-release surgery in 2008. After returning to work, he again experienced pain in his neck, back, and hands. In 2009, a doctor repeated the right carpal-tunnel-release surgery.

When he returned to work, he again had pain in his neck, shoulder, and hands. In November 2009, Wimp accepted a voluntary layoff (while work at the company was low), but he had further testing in early 2010 for the work-related injuries. A nerve-conduction test showed severe carpal-tunnel syndrome, and a doctor advised that further surgery wouldn't help. Wimp didn't return to work at the conclusion of the voluntary layoff period, and American Highway Technology let him go.

Wimp had a workers-compensation claim pending, and the parties presented extensive medical evidence in that proceeding. We will not go into great detail about that evidence because it's not contested that Wimp suffered an injury to both of his arms. The administrative law judge appointed Dr. Peter Bieri, a fellow of the American Academy of Disability Evaluating Physicians, to independently determine Wimp's disability for workers-compensation purposes. Under Kansas law, that determination is made under guidelines found in the American Medical Association's *AMA Guides to the Evaluation of Permanent Impairment* (4th ed. 1995). See K.S.A. 2014 Supp. 44-508(u).

Using those guidelines, Dr. Bieri concluded that Wimp had a 20 percent impairment of his right arm based on "residuals of entrapment neuropathy at the level of the right wrist." He concluded that Wimp had a 10 percent impairment of his left arm based on "residuals of entrapment neuropathy of the left wrist."

The Workers Compensation Board adopted Dr. Bieri's disability findings, and they are not in dispute in this appeal. What *is* in dispute is whether these injuries have left Wimp unable to find employment. The Workers Compensation Board found that Wimp was entitled to a presumption to that effect because he had an injury to both arms. K.S.A. 44-510c(a)(2) provides a rebuttable presumption that when an employee suffers a loss in both eyes, hands, arms, feet, or legs, the employee has been permanently and totally disabled. See *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, Syl. ¶ 8, 154 P.3d 494 (2007). The employer may rebut the presumption by presenting evidence that the employee is able to engage in substantial and gainful employment. *Hall v. Dillon Companies, Inc.*, 286 Kan. 777, Syl. ¶ 6, 189 P.3d 508 (2008).

The Board concluded that American Highway Technology had not rebutted the presumption; thus the Board awarded Wimp permanent-total-disability compensation. On appeal, American Highway Technology contends that it successfully rebutted the

statutory presumption by showing that Wimp's inability to find work was not just a result of his on-the-job injuries.

STANDARDS OF REVIEW ON APPEAL

The Kansas Judicial Review Act governs our review of cases arising under the Workers Compensation Act. K.S.A. 2014 Supp. 44-556(a). The Kansas Judicial Review Act provides that an agency action (here, the Workers Compensation Board acts as an agency) may be set aside only for one of eight reasons set out in the statute. American Highway Technology argues two of them on appeal: that the agency misinterpreted the law, K.S.A. 2014 Supp. 77-621(c)(4), and that the agency's factual findings were not supported by substantial evidence. K.S.A. 2014 Supp. 77-621(c)(7).

We determine legal issues independently, without any required deference to the Workers Compensation Board. *Hall*, 286 Kan. at 783; *Ballard v. Dondlinger & Sons Constr. Co.*, 51 Kan. App. 2d ___, 355 P.3d 707, 711 (2015). Whether an employee is able to engage in substantial and gainful employment is a question of fact, and we review a challenge to the Board's factual findings in light of the record as a whole to determine whether the findings are supported by substantial evidence. See K.S.A. 2014 Supp. 77-621(c) and (d); *Moore v. Venture Corporation*, 51 Kan. App. 2d 132, 137-38, 343 P.3d 114 (2015). Substantial evidence is evidence that a reasonable person might accept as sufficient to support a conclusion. See *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 263, 75 P.3d 226 (2003); *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, 363, 212 P.3d 239 (2009).

The Board, not our court, makes the factual findings, so we do not weigh conflicting evidence except to determine whether the evidence supporting the Board's decision has been so undermined by cross-examination or other evidence that a reasonable person would not accept it as support of the Board's factual findings. *Moore*,

51 Kan. App. 2d at 137-38; *Messner v. Continental Plastic Containers*, 48 Kan. App. 2d 731, 750-51, 298 P.3d 371, *rev. denied* 297 Kan. 1246 (2013); *In re Protests of Oakhill Land Co.*, 46 Kan. App. 2d 1105, 1114, 269 P.3d 876 (2012); *Herrera-Gallegos*, 42 Kan. App. 2d at 363; *Mendez v. Cargill Meat Solutions Corp.*, No. 110,052, 2014 WL 2871368, at *1 (Kan. App. 2014) (unpublished opinion).

We recognize that the Board's specific finding in this case—that American Highway Technology did not rebut the presumption of total and permanent disability—is a negative finding. In court-tried cases, appellate courts do not reverse a trial judge's negative finding unless the judge arbitrarily disregarded undisputed evidence or showed bias, passion, or prejudice. Under the amended Kansas Judicial Review Act, however, the negative-findings standard does not apply, and we instead look to the whole record and determine whether substantial evidence supports the Board's decision. See *Olds-Carter v. Lakeshore Farms, Inc.*, 45 Kan. App. 2d 390, 395, 250 P.3d 825 (2011); *Mendez*, 2014 WL 2871368, at *2.

ANALYSIS

This case mostly depends on a question of statutory interpretation, so we will start by looking at the applicable statute. The statute that applies is the one in place when the employee is injured. *Bryant v. Midwest Staff Solutions, Inc.*, 292 Kan. 585, 588, 257 P.3d 255 (2011). Here, although Wimp sustained his injuries over a period of time, the parties agreed that his date of injury for the purposes of this case was May 6, 2008. Thus, unless otherwise indicated, we cite in this opinion to the statutes in place as of May 2008.

For our purposes, the key provision of the Kansas Workers Compensation Act is K.S.A. 44-510c(a)(2), which tells us when an employee has a permanent and total disability. The statute has four sentences: the first sentence provides the general rule; the other three sentences discuss how we apply the rule under certain situations:

6

"Permanent total disability exists when the employee, on account of the injury, has been rendered completely and permanently incapable of engaging in any type of substantial and gainful employment. Loss of both eyes, both hands, both arms, both feet, or both legs, or any combination thereof, in the absence of proof to the contrary, shall constitute a permanent total disability. Substantially total paralysis, or incurable imbecility or insanity, resulting from injury independent of all other causes, shall constitute permanent total disability. In all other cases permanent total disability shall be determined in accordance with the facts." K.S.A. 44-510c(a)(2).

Before discussing American Highway Technology's argument on appeal, let's first look at each sentence of the statute and how they would seem to apply to Wimp's case:

1. The first sentence provides the overall rule that an employee is permanently and totally disabled if a work-related injury has left him or her unable to gain employment. Our court has long interpreted this to mean that an employee is permanently and totally disabled when the employee is "essentially and realistically unemployable." *Conrow v. Globe Engineering Co.*, 43 Kan. App. 2d 827, 829-31, 231 P.3d 1080 (2010); *Poff v. IBP, Inc.*, 33 Kan. App. 2d 700, 705, 106 P.3d 1152 (2005); *Wardlow v. ANR Freight Systems*, 19 Kan. App. 2d 110, 113, 872 P.2d 299 (1993).

2. The second sentence provides a rebuttable presumption of permanent total disability when a worker suffers parallel injuries (such as both feet or both hands). It's a presumption—the statute says that these parallel losses "shall constitute a permanent total disability"—but the presumption applies "in the absence of proof to the contrary," which tells us that the presumption is rebuttable. See *Hall*, 286 Kan. 777, Syl. ¶ 6; *Casco*, 283 Kan. 508, Syl. ¶ 8.

3. The third sentence provides an irrebuttable presumption of permanent total disability if the worker suffers substantially total paralysis "or incurable imbecility or insanity" resulting solely from work-related injury. It's another presumption, with the statute saying that these conditions, when solely caused by a work-related

7

injury, "shall constitute a permanent total disability," but this time it doesn't allow for proof to the contrary, so this presumption can't be rebutted.

4. The fourth sentence tells us how to determine whether there's a permanent total disability if neither of the presumptions applies: "In all other cases permanent total disability shall be determined in accordance with the facts."

To apply the statute to our case, let's first consider whether either of the presumptions would apply. The rebuttable presumption of the second sentence does apply—Wimp had injuries to both arms. The irrebuttable presumption of the third sentence does not apply—Wimp doesn't claim that he has suffered total paralysis or been rendered, in the statute's terminology, an imbecile or insane by working for American Highway Technology. Based on this reading of the statute, the Workers Compensation Board applied the rebuttable presumption, found that American Highway Technology didn't successfully rebut it, and awarded compensation based on a permanent total disability.

So what is American Highway Technology's argument? It interprets the third sentence to mean that if any preexisting "mental condition," such as a limited IQ or limited reading or writing abilities, contributes to a person's inability to get substantial employment after the injury, the employee can't be considered permanently and totally disabled. For Wimp, this would mean that because his limited IQ contributed to his inability to get a job, he can't be considered permanently and totally disabled. In our view, that's not a fair interpretation of K.S.A. 44-510c(a)(2).

First, as we've already explained, the third sentence is simply a presumption that applies when one of three things—substantially total paralysis, incurable imbecility, or insanity—is caused solely by the work-related injury. That's not the case here.

8

Second, American Highway Technology's argument rests on the assumption that Wimp's "mental conditions" are some form of "incurable imbecility." (They surely are neither paralysis nor insanity.) But that's not the case, either.

The second, third, and fourth sentences of K.S.A. 44-510c(a)(2) first came into Kansas workers-compensation law in 1917. L. 1917, ch. 226, sec. 3. When this occurred, nearly a century ago, the words "imbecile" and "imbecility" had a specific meaning, and they did not refer to things like poor reading or writing abilities or a below-average IQ.

At that time, the term "imbecile" appeared in at least three sections of the Kansas statutes. If a person gave an affidavit to the local probate court that someone living in the county was "an imbecile" (or an "idiot," "a lunatic," or even "an habitual drunkard"), the court could appoint a guardian for that person if he or she wasn't able to manage his or her own affairs. G.S. 1915, 6098. Also, Kansas statutes on marriage at that time prohibited marrying a woman under the age of 45 or a man of any age who was "epileptic, imbecile, feeble-minded, or afflicted with insanity." G.S. 1915, 6155. Statutes like this were commonplace throughout the United States. See Spencer, *Some Phases of Marriage Law and Legislation from a Sanitary and Eugenic Standpoint*, 25 Yale L.J. 58, 70-72 (1915).

In addition to these uses of "imbecile" in the Kansas guardianship and matrimonial statutes, the term had a specific meaning in criminal law. What today we would commonly call an insanity defense was available in Kansas to one who "was insane, an idiot or imbecile, or of unsound mind, at the time of the commission of the offense." If found not guilty on that basis, an "imbecile" would be committed to the "state asylum." G.S. 1915, 10044.

In this regard, Kansas was more open to an insanity defense than many states. Courts around the country drew distinctions between "idiots," "imbeciles," and "morons,"

9

with the level of impairment increasing from morons to imbeciles to idiots. In most states, only idiots were exempt from criminal responsibility; imbeciles could be responsible depending upon their individual capacity; and morons were criminally responsible. See Usman, *Capital Punishment, Cultural Competency, and Litigating Intellectual Disability*, 42 U. Mem. L. Rev. 855, 863-64 (2012). Often these classifications were applied based on IQ testing, with a person whose IQ was from 50 to 69 labeled a moron, from 25 to 50 an imbecile, and below 25 an idiot. *Tennesee Protection & Advocacy, Inc. v. Wells*, 371 F.3d 342, 352-53 (6th Cir. 2004) (describing the use of these categories in the early part of the twentieth century); *Smith v. United States*, 270 F.2d 921, 922 n.1 (D.C. Cir. 1959) (noting psychiatry and psychology texts referencing these categories); Hunter, 17 Ill. Prac., Estate Planning & Admin. § 15:9 (4th ed. 2007) (continuing to use these IQ-based categories of moron, imbecile, and idiot).

Today, these terms are rightly considered pejorative, but more neutral terms that parallel these graded classifications have continued in place. See Faigman *et al*., 2 Modern Scientific Evidence: The Law and Science of Expert Testimony § 9:24 (2014-2015 ed.). Recognizing that IQ tests have variability, a more modern guide provided these somewhat overlapping standards for the evaluation of mental retardation: IQ 50 to 70, mild mental retardation; IQ 35 to 55, moderate retardation; IQ 20 to 40, severe mental retardation; and IQ below 20 or 25, profound mental retardation. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 42 (4th ed. 2000). More recently, the United States replaced references in federal statutes to mental retardation with references to intellectual disability, see Rosa's Law, Pub. L. 111-256, 124 Stat. 2643 (2010), and Kansas made the same change in 2012. See K.S.A. 65-6234; L. 2012, ch. 91. The most recent edition of the Diagnostic and Statistical Manual of Mental Disorders now uses the "intellectual disability" terminology as well. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013). That edition also places greater emphasis on a person's adaptive functioning

(such as the ability to participate in social activities or to live independently) than on IQ scores. See Modern Scientific Evidence § 9:24.

The point for our purposes, though, is a simple one: the term "imbecility," when placed in our workers-compensation statutes in 1917, had a defined meaning. And it did not come close to including someone like Donald Wimp, who has an IQ score of 86 and graduated from high school. An 86 IQ score places a person in the "low average" category. See Flanagan & Caltabiano, *Test Scores: A Guide to Understanding and Using Test Results* (available at http://goo.gl/FETzgS). The third sentence of K.S.A. 44-510c(a)(2) simply doesn't apply to Wimp at all—he is not substantially paralyzed, insane, or an imbecile.

American Highway Technology has cited one appellate case that does support its position, *Nelson v. Capital City Moving & Storage*, 32 Kan. App. 2d 566, 85 P.3d 728 (2004), *rev. granted* May 25, 2004, *appeal dismissed by stipulation* August 23, 2004. In that case, a panel of our court held that if an employee's inability to find work was due in part to the employee's limited intellectual ability, the employee could not be considered totally and permanently disabled unless that limited intellectual ability (which our panel called a "mental condition") was caused by work-related injuries. 32 Kan. App. 2d 566, Syl. ¶¶ 3-4. We do not find the *Nelson* decision persuasive here.

First, the decision lacks precedential value. When our Supreme Court grants review, the decision of our court, by rule, has "no force or effect." Supreme Court Rule 8.03(j) (2014 Kan. Ct. R. Annot. 77). After the Supreme Court granted review in *Nelson*, the parties filed supplemental briefs, and two groups, the Kansas Trial Lawyers Association and the Kansas AFL-CIO (a labor organization), filed friend-of-the-court briefs arguing that our court's statutory analysis was mistaken. After those briefs were filed, the parties dismissed the appeal, presumably having settled the case.

11

We recognize that a losing party cannot simply nullify an appellate court's reasoned opinion by buying off the other side in settlement. See *Singh v. Carnival Corp.*, 550 Fed. Appx. 683, 686-87 (11th Cir. 2013), *cert. denied* 134 S. Ct. 2729 (2014). Here, though, our Supreme Court granted review before the parties settled the case. Rule 8.03(j) then made our decision "of no force or effect," and no further action by our court or the Kansas Supreme Court addressed the merits of the case.

Second, even if we look to the *Nelson* decision merely for its reasoning, we do not choose to follow it. As far as we can tell, no one presented the *Nelson* court with the legislative history that showed the entry of the term "imbecility" into our workers-compensation statutes in 1917 or explained that the term had a specific and known meaning at that time. That history is quite important: When construing a statute, technical words or ones that have a "peculiar and appropriate meaning in law[] shall be construed according to their peculiar and appropriate meanings." K.S.A. 77-201 *Second*; see *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 527, 113 P.3d 241 (2005). In addition, "[t]he words of a statute must be taken in the sense in which they were understood at the time the statute was enacted." *United Parcel Service, Inc. v. Armold*, 218 Kan. 102, 107, 542 P.2d 694 (1975). Accordingly, we must give "imbecility" the meaning it had acquired in law at the time of enactment. And since Wimp would not fall into the category of "imbecile," the third sentence of K.S.A. 44-510c(a)(2) has no application whatsoever in our case.

Given that understanding, the Board correctly applied the statute. Under the second sentence of K.S.A. 44-510c(a)(2), the Board applied a rebuttable presumption that Wimp was totally and permanently disabled because he was unable to gain employment. The Board then considered the evidence presented by both sides to determine whether American Highway Technology had effectively rebutted that presumption and concluded that it hadn't.

12

American Highway Technology argues that the Board's conclusion that it didn't effectively rebut the presumption isn't supported by substantial evidence. But its argument here is contingent upon its interpretation of K.S.A. 44-510c(a)(2): "*If* the appropriate interpretation of [the statute] is applied, as in *Nelson*, Wimp remains capable of engaging in substantial and gainful employment; therefore, the Board's Order is not supported by substantial competent evidence and should be reversed." (Emphasis added.) Of course, we have already rejected that legal argument. Accordingly, the Board properly considered and relied on testimony from vocational experts on the effects of Wimp's injuries on his employability.

That evidence fully supports the Board's ruling. The Board relied on the testimony of Karen Terrill, a vocational-rehabilitation consultant. She reviewed Wimp's employment history, and she testified that she was familiar with the labor market in southeast Kansas, where Wimp lives. Based solely on the work restrictions provided by Dr. Bieri, the court-appointed expert, she concluded that Wimp was unable to perform 8 of the 12 work-related tasks he had done in past employment. She noted that he had always engaged in work that had a heavy or very heavy physical demand; that he had no knowledge of computers, could not type, and could not read a newspaper; and that his test scores showed limited ability (at a grade-school level) in reading and math and an extremely low score for "fluid reasoning," the ability to solve problems using inductive or deductive reasoning. Based on his abilities, his work history, and Dr. Bieri's limitations on what he can do physically, she concluded that Wimp was no longer able to engage in substantial gainful employment.

To be sure, there was other evidence in the record that supported the employer. It hired Steve Benjamin, another vocational-rehabilitation consultant, who testified that Wimp was still employable. But Benjamin relied only on the work restrictions of Dr. Paul Stein, who examined Wimp at the employer's request. The Board ultimately relied upon Dr. Bieri's rating, not Dr. Stein's. American Highway Technology has not shown any

13

reason that the Board could not properly rely upon the opinions and testimony of Terrill and Dr. Bieri. This is not a case in which their testimony was so undermined by cross-examination or other evidence that a reasonable person could not rely upon it in reaching a conclusion about the case. The Board's conclusion that American Highway Technology failed to rebut the presumption that Wimp was permanently and totally disabled was supported by substantial evidence.

CONCLUSION

We close with a note about the current version of the statute, K.S.A. 2014 Supp. 44-510c(a)(2). As amended in 2011, the second, third, and fourth sentences we have discussed at length in this opinion were eliminated. See L. 2011, ch. 55, sec. 7. Thus, the pejorative term "imbecility" has been removed. After that change, the terms "imbecile" and "imbecility" no longer appear in the statutes of Kansas. We hope, therefore, that this will be the case of last impression on the subject. We have published this opinion, though, because the statute in place on the date of injury controls under the Kansas Workers Compensation Act, so other cases under the old statute may still be moving through the adjudicative process.

In summary, then, the Board correctly interpreted and applied K.S.A. 44-510c(a)(2), and substantial evidence supports its determination that Wimp was totally and permanently disabled. We therefore affirm its decision.