NOT DESIGNATED FOR PUBLICATION

No. 122,149

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

COREY JENNINGS,
*Appellant/Cross-appellee*,

v.

T ROWE PIPE LLC,
*Appellee*,

and

KANSAS WORKERS COMPENSATION FUND,
*Appellee/Cross-appellant.*

MEMORANDUM OPINION

Appeal from Workers Compensation Appeals Board. Opinion filed November 6, 2020. Affirmed.

*Jan L. Fisher*, of McCullough, Wareheim & LaBunker, of Topeka, for appellant/cross-appellee.

*E. L. Lee Kinch*, of Wichita, for appellee/cross-appellant.

Before BRUNS, P.J., WARNER, J., and BURGESS, S.J.

PER CURIAM:  Corey Jennings appeals from the award of benefits by the Workers Compensation Board (Board). Although the Administrative Law Judge (ALJ) denied Jennings' claim, the Board modified the ALJ's decision and found that Jennings suffered a temporary hip injury—but not a fracture—arising out of an incident occurring in the course of his employment on March 22, 2015. As a result, the Board awarded Jennings $400 in unauthorized medical expenses. Thereafter, Jennings appealed and the Kansas

1

Workers Compensation Fund (Fund) filed a cross-appeal. Finding that there is substantial competent evidence in the record to support the Board's award, we affirm.

FACTS

Jennings—who was born in 1979—resides in Arkansas City. In December 2014, he began working for T Rowe Pipe, LLC. The limited liability company performed custom fabrication for industrial pipe and was registered in Oklahoma. However, it appears that T Rowe Pipe, LLC, is no longer doing business and it is not participating in this appeal. Under K.S.A. 2019 Supp. 44-532a, if an employer cannot be located and required to pay workers compensation, the injured worker may apply for an award of workers compensation benefits to be paid from the workers compensation fund. Since Jennings was unable to locate T Rowe Pipe, the Fund became the party responsible for the award of workers compensation benefits.

Around 2007 or 2008, Jennings was diagnosed with sarcoidosis, which is an inflammatory disease that can affect the bones and multiple organs in the body. His health care providers prescribed Prednisone—which is a high-dose steroid—to treat the sarcoidosis. Although high-dose steroids are not a cure for sarcoidosis, they are prescribed in an attempt to decrease the rate of progression of the disease. Unfortunately, high-dose steroids are known to potentially lead to avascular necrosis or damage to bone tissue due to lack of blood supply. Another side effect of the long-term use of high-dose steroids is the possibility of developing subchondral or stress fractures that occur on the weight bearing surface of a bone.

On March 22, 2015, while working in the paint and sandblast department of T Rowe Pipe, Jennings was assigned to a project in Roger Mills County, Oklahoma. While operating a "jeeper" machine—which is rolled along buried pipe to identify dents or nicks that may need repair—Jennings had to go into a trench and lie down in a confined

2

area to test a pipe that was about 3 inches above the bottom of the trench. Jennings reported that after he was finished and sat up, he "heard a loud pop" and "felt pain on his left side." He further explained, "[a]fter about 10 minutes, [a] couple of co-workers helped me up out of the trench into a 36-inch pipe . . . where I sat down and waited for the pain to go away so that I could get back to work."

After four hours, the pain did not go away and Jennings was taken to the emergency room at Roger Mills Memorial Hospital in Cheyenne, Oklahoma. According to the hospital records, Jennings reported:  "Was on the ground today and heard a pop—pain has been getting worse since. Now—4 hours later cannot bear [weight] on left hip area. Hip aching for 3 months usually take 800 mg Ibuprofen & pain gets better. [History] of sarcoidosis . . . ." The hospital records further stated:  "[Complains of] left hip pain, gradual onset over the past month usually responds partially to Ibuprofen 800, but now has progressed to the point he cannot bear weight." In addition, the hospital records noted a history of:  "Sarcoidosis diagnosed [approximately] 7 years ago usually takes Prednisone 80g daily, has been out for [about] 1 month."

An x-ray of Jennings' hip taken at the hospital did not show any abnormality. However, he was given a shot of Toradol for pain and a steroid injection to reduce the swelling. Upon discharge, Jennings was diagnosed with left hip pain and sarcoidosis. A doctor renewed his prescription for Prednisone and directed Jennings to see his primary care physician for refills. He was also directed to consult an orthopedic surgeon if his hip pain persisted. However, Jennings did not seek medical attention for hip pain again until nearly 10 months later. Although he saw a physician for pain and swelling in his right wrist—which turned out to be caused by a small fracture—on August 29, 2015, the medical records do not indicate that Jennings complained about hip pain, nor was a history of a hip injury noted.

Jennings returned to work the day after the incident at work. Although he apparently spent the day sitting in a truck, he was ultimately assigned to light duty and drove a forklift for about a week before being laid off because the company was downsizing. After being laid off, Jennings applied for and received unemployment benefits. In August 2015, he was hired by the South Central Kansas Medical Center to perform floor maintenance. According to Jennings, he continued to experience pain in his left hip and had a limp.

On January 5, 2016, Jennings sought medical care from Dr. Eric Thomson, who is a family practitioner. He complained of left leg numbness and tingling as well as occasional swelling. Dr. Thomson noted "sarcoidosis, greater than three years" and ordered a left lower extremity venous doppler examination. The results of the test, which was performed on January 7, 2016, were negative for a deep venous thrombosis.

A few weeks later, Jennings went to see a chiropractor, Dr. Doug Swanson, for treatment. The notes from the visit state in part: "lower back and leg pain. *Onset*: gradual. *Cause of symptoms:* unknown." Jennings reported his pain as "burning, sharp throbbing, tingling, [and] deep." Dr. Swanson's records do not mention the work incident on March 22, 2015. Dr. Swanson's assessment of Jennings' condition was "Lumbago with sciatica"—which is pain radiating from the back down the leg—on the left side. Jennings received chiropractic treatments on five occasions from January 22, 2016, to February 8, 2016.

Subsequently, Dr. Thomson referred Jennings to Dr. Damion Walker, an orthopedic surgeon specializing in hip surgery. Dr. Walker ordered x-rays of Jennings' left hip that were taken on February 15, 2016. According to the medical record, the x-rays revealed a "'[m]arked flattening and sclerotic change involving the left femoral head. This may be due to prior osteonecrosis versus congenital abnormality.'" Osteonecrosis is the death of bone tissue due to a lack of blood supply. Dr. Walker examined Jennings the

4

following day. At that time, Jennings reported having hip pain associated with a work injury that occurred on March 22, 2015. Interestingly, the work incident is described as a fall while climbing out of a ditch. Regardless, Dr. Walker's diagnosis was osteonecrosis due to previous trauma.

In his records, Dr. Walker noted:  "left hip/groin pain, post-traumatic avascular necrosis left femoral head with secondary osteoarthritis, degenerative joint disease." He also noted that his review of the x-rays "demonstrates essentially the top half of the femoral head to be entirely absent or flattened." Yet, Dr. Walker could not determine "whether [Jennings] had an actual femoral head fracture or whether this extreme flattening is a result of avascular necrosis." Ultimately, Dr. Walker recommended a total hip replacement and instructed Jennings not to return to work.

On March 15, 2016, Jennings filed a workers compensation claim against T Rowe Pipe claiming that he had fractured the neck of his left femur at work. In his deposition, Jennings disputed the accuracy of the emergency room records from the day of the work incident. Specifically, he testified that the notations in the medical record—one by a nurse and the other by a physician or physician's assistant—that Jennings had suffered hip pain over three months that had gradually progressed over the past month were incorrect. Rather, Jennings claimed that he did not have any problems with his left hip prior to being injured at work on March 22, 2015. He also suggested that the emergency room personnel misunderstood him when he told them that he had a prior left knee injury.

Jennings' attorney sent him for an evaluation by Dr. C. Reiff Brown, a board-certified orthopedic surgeon who graduated from medical school in 1957. Dr. Brown retired from the clinical practice of medicine in 2000 and now confines his practice to performing medical examinations as a consultant. In his deposition, he acknowledged that the x-rays taken at the hospital on March 22, 2015, appeared normal with the exception of "some decrease in the amount of calcium that was present in the bone."

5

Nevertheless, Dr. Brown opined that the work injury "caused a fracture of [Jennings'] already softened bone because of the sarcoidosis."

Dr. Brown surmised that the sound Jennings heard when he sat up in the ditch was a nondisplaced fracture of the proximal femur. Dr. Brown testified that in his opinion Jennings' injury on March 22, 2015, resulted in osteonecrosis and that the accident was the prevailing factor in causing the fracture. After evaluating Jennings again on September 2, 2016, Dr. Brown continued to render the opinion that there was a causal connection between the work incident and the fracture. However, he did agree that high-dose steroids—such as Prednisone—can cause avascular necrosis and cause the death of bone tissue.

Also at the request of his attorney, Jennings was examined by Dr. George Fluter, a physical medicine and rehabilitation physician, on January 15, 2018. According to Dr. Fluter, Jennings jumped 5 feet into a trench to repair a pipe when he heard a snap at the left hip or leg and could not move. However, when the discrepancy between his notes and Jennings' preliminary hearing account of his injury was pointed out, Dr. Fluter claimed it did not make any difference in his conclusions. Dr. Fluter also acknowledged that he was told that the emergency room x-rays showed the hip had cracked, which was again a discrepancy from the actual hospital records.

After reviewing the x-rays taken on March 22, 2015, Dr. Fluter agreed that they showed Jennings' hip to be within normal limits. Although Dr. Fluter recognized that the chronic use of Prednisone is a risk factor for developing osteonecrosis, it was his opinion that the work incident caused a new injury. In particular, Dr. Fluter opined that Jennings fractured his femoral head on March 22, 2015, and that the fracture led to the avascular necrosis. Dr. Fluter also opined that the work injury was the prevailing factor for Jennings' fracture.

6

Specifically, Dr. Fluter testified:

"The initial x-rays did not show a fracture. It wasn't until about ten or 11 months later that the, I don't know if it was a CAT scan or x-rays that were done that showed changes. So I think something happened between the initial [in]citing event . . . in March of 2015, the snap occurred. He sought medical care for it. X-rays didn't show any fracture at that time, but I think a fracture occurred at that time, it was just not detected at the x-ray because again, you don't always detect acute fracture. . . And that by the time, 11 months later roll around and he has the x-rays done, it shows progression of the condition to the point of having avascular necrosis. Otherwise, it just happened . . . out of nowhere. And I feel under the circumstances that whatever the specific circumstances of that pop occurring, that represented the time of the injury when the fracture occurred."

The ALJ appointed Dr. Pat Do, a board-certified orthopedic surgeon, to perform an independent medical examination of Jennings. In particular, the ALJ requested that Dr. Do address the following issues: (1) diagnosis; (2) recommendations for treatment; (3) the claimant's ability to work and, as appropriate, temporary work restrictions; (4) whether claimant's alleged accident or repetitive trauma was the prevailing factor in causing the claimant's injury, and the need for treatment or resulting impairment or disability, if any; and (5) other issues as specified in the joint letter from the attorneys. On August 3, 2016, Dr. Do examined Jennings and issued his independent medical report, which was received by the ALJ two days after the examination.

With respect to Jennings' medical history, Dr. Do reported:

"[Jennings] is currently 36 years old and a very accurate historian and very pleasant gentlemen whom describes specifically a no-fall and no-impact injury but, 'guess just rolled wrong' and that he, while leaning forward, heard 'a loud snap' in his left hip.

"He has been on high-dose prednisone which is [a] high-dose steroid very well-known to cause avascular necrosis and subtle subchondral fractures that are a known consequence of high-dose steroids. He states he has been on this since 2007 or 2008, he is not sure. He

7

also tells me that Dr. Gilroy up in the Kansas City area at KU Medical School also informed him of the risk of osteonecrosis and subchondral fractures and osteoporosis with high-dose steroids. Unfortunately, he has to take these high-dose steroids because of his sarcoidosis.

"Again, there was no fall on the left hip, no injury, he just 'rolled wrong.'"

Dr. Do found that the x-rays taken on March 22, 2015, showed "a normal-looking left hip." In contrast, he found that the x-rays taken on February 16, 2016, showed "marked flattening of sclerotic changes of the left femoral head." Consequently, Dr. Do rendered the opinion that Jennings had a "[l]eft hip osteonecrosis—at this point in time, probably stage IV." Moreover, although Dr. Do did not find that the work injury caused the osteonecrosis, he did agree that Jennings should undergo a total hip replacement in light of his medical condition.

In his deposition, Dr. Do reiterated the history, diagnosis, and opinions set forth in his written report. He defined osteonecrosis as "essentially dead bone" and explained that stage IV osteonecrosis means that the cartilage is worn out and that Jennings has developed a marked deformity—with bone rubbing on bone—in his hip joint. Regarding the issue of causation, Dr. Do testified within a reasonable degree of medical probability as follows:

"Within a reasonable degree of medical probability, his described work incident of 'rolling wrong' is not the causative factor in is current need for treatment [of] his left hip nor any kind of resulting impairment. If his rolling wrong caused any kind of fracture of his hip, he would have had ongoing pain ever since that date; however, if you get his history, he actually had good days and bad days, and it was not until more recently that it got pretty progressive and severe. A femoral neck fracture would have left him unable to bear weight from the get-go, if you will, on 03/22/2015."

8

Additionally, Dr. Do reported that the "rolling and twisting" of Jennings' hip on March 22, 2015, did not cause "any kind of new physical finding or any kind of change in physical structure that was not already present in his left hip." When asked his opinion regarding the prevailing factor in causing Jennings' medical condition, Dr. Do testified that the problem developed over time and "his work incident . . . is not the prevailing factor in his current need for treatment of his hip or any kind of resulting impairment."

Dr. Do explained:

"Usually for avascular necrosis you can have [. . .] traumatic causes or non-traumatic causes. [A] [t]raumatic caus[e] usually in a young person would be pretty severe where it would have to cut off the actual blood vessel to the actual hip, particularly with a high-energy injury like an automobile accident. Non-traumatic causes would be blood disorders. Some association with the use of steroids. Idiopathic, meaning you don't know why. Alcohol use, as well as some autoimmune disorders can cause—or not cause, but contribute to developing osteonecrosis."

In Dr. Do's opinion, the prevailing or primary factor causing Jennings' hip fracture was his long-term use of anti-inflammatory medication—specifically Prednisone—that led to avascular necrosis and osteonecrosis—not the incident on March 22, 2015. At the Fund's request, Dr. Do saw Jennings again on May 23, 2018. Dr. Do was also provided with additional documents to review, including medical records from Jennings' examination by Dr. Walker, Dr. Brown's report, and Dr. Fluter's report. After examining Jennings again and reviewing the additional documents, Dr. Do continued to opine that the incident of March 22, 2015, did not cause the medical condition that required a hip replacement.

In his second report, Dr. Do stated:

"I see from Dr. Fluter that he felt that corticosteroid or prednisone is a risk factor for development of osteonecrosis of the left hip but that the event of March of 2015 was

9

not an aggravation or acceleration of a pre-existing condition. I certainly understand both of those view points and I do not think any one of us is more right or wrong than another. My understanding of prevailing factor is defined as 'primary factor in relation to any other factor' is how I came about my causation opinion. With the mechanism of action whether by my interpretation of what Mr. Jennings told me or by the interpretation given to him to Dr. Fluter or Dr. Brown is not extensive enough to be the primary factor in relation to any other factor. This is my opinion within a reasonable degree of medical probability. I do not think his describe[d] work injury was the primary factor. I think it did not change the natural history of him being on chronic steroids leading to avascular necrosis in this kind of scenario."

Dr. Do was deposed for a second time on July 11, 2018, and admitted that he did not have a complete understanding of all of the legal terms used in workers compensation law. However, he testified:

"[F]rom a medical standpoint, . . . I believe we see avascular necrosis a lot, a little bit higher in African-Americans, higher in folks with chronic prednisone or steroid use which Mr. Jennings had. Taking all those things into account and his mechanism of injury, it is my belief that the primary factor would be his chronic steroid use and his higher risk being African-American for the avascular necrosis than it was, for instance, what Dr. Fluter mentioned in his report, the muscular effort. So in my opinion, based off my medical understanding only, that his work-related accident wouldn't be. But, I don't know the law, so—"

On cross-examination, although Dr. Do acknowledged he found no apparent preexisting hip impairment, he found Jennings' medical history as well as his description of the work injury to be significant in determining the medical causation. In particular, Dr. Do noted that Jennings did not report a fall or other traumatic injury occurring on March 22, 2015. According to Dr. Do, it would a take severe trauma to cause the type of fracture that would cut off the blood supply to the femoral head resulting in acute osteonecrosis. Consequently, Dr. Do reaffirmed his opinion that Jennings' current

10

medical condition and need for a hip replacement "is not casually related to his work injury under prevailing factor."

Administrative Law Judge Gary K. Jones held a hearing on Jennings' claim on December 12, 2018. Although Jennings and the Fund participated in the hearing, no one appeared on behalf of T Rowe Pipe. At the hearing, the ALJ asked questions of both parties. In addition, he considered various deposition transcripts and exhibits offered into evidence. The ALJ also considered several stipulations agreed to by the parties.

On March 20, 2019, the ALJ issued a 13-page decision in which he concluded that "the alleged accident is not the prevailing factor for the claimant's injury, medical condition and resulting disability." Accordingly, the ALJ denied Jennings' request for workers compensation benefits. In reaching this decision, the ALJ reasoned:

> "First, the Court finds that the Claimant had a preexisting condition. His hip bone was weakened by years of use of high-dose cortisone to control his sarcoidosis. The Court finds Dr. Do's report on this persuasive. Dr. Brown also opined that the Claimant had soft bones as a result of years of steroid use.

> "The Court also concludes that this condition was symptomatic before March 22, 2015, as shown by the Roger Mills Memorial Hospital records of March 22, 2015. The Roger Mills Memorial Hospital records report in two places that the Claimant had prior hip pain. The records are written in two different handwritings and are signed or initialed by two different people. There is some variation between the two reports of preexisting problems which indicates one reporter did not just copy the other. The Claimant's explanation that his knee hurt but not his hip is not credible.

> "Was there a physical change in the Claimant's body on March 22, 2015? The Court finds Dr. Do's opinion more persuasive than that of the Drs. Brown or Fluter and concludes there was no change in the physical structure of the Claimant's body. Dr. Do performed his IME at the request of the Court, and his opinion is more neutral. He is an actively practicing orthopedic surgeon. Dr. Brown relied on a cell phone picture of the x-

11

ray, but Dr. Do had the x-ray films. Dr. Fluter relied on an incorrect description of the mechanism of injury."

The ALJ also found it to be significant that there was no acute injury shown on the x-rays taken at Roger Mills Memorial Hospital on March 22, 2015. Moreover, the ALJ noted that the hospital records indicated that Jennings had reported pain in his hip for months. In addition, the hospital records indicated that Jennings was told to follow up with an orthopedic surgeon if his pain did not get better. However, the ALJ found that Jennings continued working following the incident and did not seek medical treatment again until January 2016.

On March 29, 2019, Jennings filed a timely application for review to the Board. After hearing oral argument on September 12, 2019, the Board entered a 14-page unanimous order on October 31, 2019. In the order, the Board agreed with the ALJ that Jennings "did not sustain a fracture of his left hip when he rolled over and attempted to sit up on March 22, 2015." Although the Board recognized that Jennings argued that the emergency room nurse on the day of the incident misinterpreted his remarks regarding his medical history, it found that this argument was not persuasive.

Nevertheless, the Board modified the ALJ's award and ordered the Fund to reimburse Jennings for unauthorized medical expenses in the amount of $400. In doing so, the Board explained that even though Jennings did not fracture his femoral head on March 22, 2015, he did temporarily injure his hip that caused swelling. The Board explained that Jennings was able to return to work, eventually developed osteonecrosis— likely due to his long-term use of Prednisone—and later fractured his femoral head.

Thereafter, Jennings filed a timely petition for judicial review to this court.

12

*Issues Presented and Standard of Review*

On appeal, Jennings raises two issues. First, whether the Board erred as a matter of law by relying on medical testimony that allegedly applied an incorrect causation standard. Second, whether the Board erred as a matter of law when it concluded that Jennings' injury was only temporary in nature. Likewise, in its cross-appeal, the Fund raises the issue of whether there is substantial evidence in the record to support the Board's conclusion that Jennings suffered a temporary injury.

As provided for in the Workers Compensation Act (the Act), K.S.A. 2019 Supp. 44-501 et seq., we review the Board's order under the Kansas Judicial Review Act, K.S.A. 77-601 et seq. K.S.A. 2019 Supp. 44-556(a). The claimant—in this case Jennings—has the burden of proof to establish the right to an award of compensation under the Act. K.S.A. 2019 Supp. 44-501b(c); see *Moore v. Venture Corp.*, 51 Kan. App. 2d 132, 137, 343 P.3d 114 (2015). If a claimant meets his burden, the employer—in this case the Fund standing in the shoes of the employer—has the burden of proving relief from that liability based upon any statutory defense or exception. See *Messner v. Continental Plastic Containers*, 48 Kan. App. 2d 731, 751, 298 P.3d 371 (2013). On appeal to this court, the party claiming error has the burden to establish that error. K.S.A. 77-621(a)(1); see *Roles v. The Boeing Co.*, 43 Kan. App. 2d 619, 624, 230 P.3d 771 (2010).

Our review of questions involving the interpretation or construction of a statute is unlimited and we owe no deference to the Board on this issue. *Fernandez v. McDonald's*, 296 Kan. 472, 475, 292 P.3d 311 (2013). However, "the ultimate question of whether an accident arises out of and in the course of employment is a question of fact." *Estate of Graber v. Dillon Companies*, 309 Kan. 509, 513, 439 P.3d 291 (2019). Furthermore, we

are to review a challenge to the Board's factual findings in light of the record as a whole to determine whether those findings are supported by substantial evidence. K.S.A. 77-621(c)(7).

In other words, we must determine the adequacy of the evidence in the record

"in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record . . . including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the [Board's] explanation of why the relevant evidence in the record supports its material findings of fact." K.S.A. 77-621(d).

Likewise, substantial evidence refers to "'"evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis [of fact] from which the issue raised could be easily resolved.' [Citation omitted.]" *Rogers v. ALT-A & M JV*, 52 Kan. App. 2d 213, 216, 364 P.3d 1206 (2015). In reviewing the evidence in light of the record as a whole, we are not to reweigh the evidence or engage in de novo review. *Atkins v. Webcon*, 308 Kan. 92, 96, 419 P.3d 1 (2018). Nevertheless, the ultimate determination of whether the Board's findings are supported by substantial competent evidence is a question of law. 308 Kan. 95.

In other words, after reviewing all of the evidence in the record, our role is to determine whether the evidence in support of the Board's decision "has been so undermined by cross-examination or other evidence that it is insufficient to support its decision." *Moore*, 51 Kan. App. 2d at 138. However, in doing so, we are not to reweigh the evidence or engage in de novo review. K.S.A. 77-621(d). Accordingly, based on these standards of review, we should not disturb the Board's findings of fact if they are supported by substantial competent evidence.

*Prevailing Factor Causing Hip Fracture*

Under the Workers Compensation Act, employers are liable to pay compensation benefits if "an employee suffers personal injury by accident, repetitive trauma or occupational disease arising out of and in the course of employment." K.S.A. 2019 Supp. 44-501b(b). Personal injury means "any lesion or change in the physical structure of the body, causing damage or harm thereto." K.S.A. 2019 Supp. 44-508(f)(1). Accidental injuries resulting in a new physical finding—or a change in the physical structure of the body—are compensable even if the claimant has sustained an aggravation to a preexisting condition as long as the preexisting condition was the primary cause of the injury. *Buchanan v. JM Staffing*, 52 Kan. App. 2d 943, 949, 379 P.3d 428 (2016).

The phrases "arising out of" and "in the course of" have separate and distinct meanings. A claimant must show that each condition exists before an injury is compensable. Here, there is no dispute that if Jennings was injured on March 22, 2015, it was in the course of performing services for his employer. Instead, the issue is whether the alleged injury arose out of Jennings' employment. To arise out of one's employment, a claimant must establish a causal connection between the accidental injury and the nature, conditions, obligations, and incidence of employment. K.S.A. 2019 Supp. 44-508(f)(2)(B)(i).

K.S.A. 2019 Supp. 44-508(f)(2)(B) provides:

"An injury by accident shall be deemed to arise out of employment only if:
    "(i) There is a *causal connection* between the conditions under which the work is required to be performed and the resulting accident; and
    "(ii) the accident is the *prevailing* factor causing the injury, medical condition and resulting disability or impairment." (Emphases added.)

15

K.S.A. 2019 Supp. 44-508(g) defines "prevailing factor" as "the primary factor, in relation to any other factor." Accordingly, an injury is recoverable only if the work accident—and not a preexisting condition—is the primary factor in causing the injury and resulting impairment. See K.S.A. 2019 Supp. 44-508(d); *Buchanan*, 52 Kan. App. 2d at 949; *Cramer v. Presbyterian Manors*, No. 119,581, 2019 WL 4558050, at *5 (Kan. App. 2019) (unpublished opinion) (work accident was not the primary factor causing claimant's aggravated disc disease apart from the new physical findings). In this action, neither the ALJ nor the Board found the incident at Jennings' work on March 22, 2015, to be the prevailing or primary factor in causing the fractured femoral head that resulted in his need for hip replacement surgery.

Ultimately, the Board concluded in this action:

"The . . . claimant sustained a left hip injury on March 22, 2015, arising out of and in the course of his employment, but that said hip injury was temporary in nature. The Board finds claimant did not fracture his hip on March 22. Claimant returned to work and eventually developed osteonecrosis, likely from his use of Prednisone, and later fractured his femoral head."

Based on our review of the entire record, we find that this conclusion is based on substantial competent evidence. In reaching its conclusion, the Board pointed to the following evidence:

- The x-ray of Jennings' left hip taken at the hospital on March 22, 2015, did not show a fracture or any abnormality. In contrast, the Board noted that the x-rays taken nearly a year later showed a fracture.
- The medical history given by Jennings to the emergency room personnel on March 22, 2015, revealed:
  - a diagnosis of sarcoidosis about seven years before the emergency room visit;

16

- long term use of Prednisone to treat the sarcoidosis;

- aching in the left hip for three months with use of Ibuprofen to reduce pain; and

- progression of hip pain to the point that Jennings could not bear weight.

- Although Jennings was instructed upon discharge from the emergency room to see an orthopedic surgeon if he continued to have hip pain, he did not seek additional medical treatment for his hip pain until nearly 10 months later.

- Jennings was able to return to light duty with T Rowe Pipe and subsequently worked for a different employer until February 2016.

We note that Jennings disputes the notations made by the health care providers regarding his prior history of left hip pain. However, the Board did not find his testimony to be persuasive. Specifically, the Board found that the emergency room records stated "in two places that [Jennings] had prior hip pain." The Board also found that the history of prior hip pain was "written in two different handwritings and are signed or initialed by two different people" and that "[t]here is some variation between the two reports of preexisting problems which indicates one reporter did not just copy the other."

Of course, it is not our role to reweigh the evidence or to engage in de novo review. See *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014). Instead, the ALJ and the Board were the finders of fact in this action and had the authority to weigh the conflicting evidence to determine what they found to be persuasive. Here, the findings of the ALJ and the Board regarding Jennings' preexisting hip pain is clearly supported by the record. In addition, we find the Board's explanation regarding why it believed the notations in the emergency room records to be more persuasive than Jennings' testimony on this question to be reasonable.

17

In reaching its decision in this action, the Board also found the opinions expressed by Dr. Do to be more persuasive than the opinions offered by the other two physicians who rendered opinions in this workers compensation action. First, the Board noted that unlike the other two physicians, Dr. Do was originally appointed by the ALJ to perform an independent medical examination. Second, the Board noted that Dr. Do actively practices orthopedic medicine and reviewed the actual x-ray films before rendering his opinion. Third, the Board noted that one of the other physicians had only reviewed a cell phone picture of the x-rays. Fourth, the Board noted that one of the other physicians had relied on an incorrect description of the mechanism of injury in initially rendering his opinion and found it to be "problematic" that he "did not change his opinion after he learned the true mechanism of injury" and "did not have Dr. Walker's records" when he evaluated Jennings.

In concluding that Jennings did not fracture his left hip on March 22, 2015, the Board found Dr. Do's testimony to be persuasive. The Board pointed to Dr. Do's testimony that the mechanism of injury—rolling over and attempting to sit up in a ditch—"would not be sufficient to cause a fracture even in someone whose bones were soft from sarcoidosis treatment." The Board also pointed to Dr. Do's testimony that Jennings "would not have been able to bear weight on his left leg if he fractured his hip" and that he would not have reported to have "good days and bad days" had he suffered a fracture at work.

Although Jennings argues that Dr. Do applied an incorrect causation standard, we do not find this to be an accurate description of his deposition testimony. As the Board noted, Dr. Do is a board-certified orthopedic surgeon who continues to actively practice clinical medicine and was appointed by the ALJ to perform an independent medical examination. Dr. Do candidly testified that he is not an expert in the law and, as a physician, he appropriately rendered his causation opinions within a reasonable degree of probability.

18

In addition, Dr. Do testified that his understanding of the term "prevailing factor" as used in workers compensation actions means the "primary factor in relation to any other factor." We find this understanding to be consistent with the provisions of K.S.A. 2019 Supp. 44-508(g). Further, it is not essential that a medical expert completely understand the legal principles of workers compensation. Rather, the primary role of a medical expert is to render opinions within a reasonable degree of medical probability based on the evidence. In turn, it is the role of the ALJ and the Board to weigh conflicting evidence—including the opinions of medical experts—to reach a legal conclusion regarding the prevailing or primary factor. See K.S.A. 2019 Supp. 44-508(g) ("In determining what constitutes the 'prevailing factor' in a given case, the administrative law judge shall consider all relevant evidence submitted by the parties").

In reaching this conclusion, the Board considered our decision in *Le v. Armour Eckrich Meats*, 52 Kan. App. 2d 189, 364 P.3d 571 (2015). In doing so, the Board found it to be distinguishable from this action. As the Board recognized, both *Le* and this case involve claimants with preexisting conditions. However, the mechanism of injury was substantially different. In *Le*, the claimant suffered a traumatic fall onto a concrete floor at her place of employment and it was undisputed that she sustained a vertebral fracture. In contrast, Jennings was lying in a ditch when he rolled over and attempted to sit up, and the issue of whether he sustained a hip fracture is disputed.

Like the Board, we recognize that not all injuries are caused by a fall or other traumatic force. See *Bryant v. Midwest Staff Solutions, Inc.*, 292 Kan. 585, 586, 257 P.3d 255 (2011) (claimant was injured when he reached for a tool belt as he bent down). However, as indicated above, there is substantial evidence in the record—including the medical records and expert testimony—that supports the Board's conclusion in this action that the incident at work on March 22, 2015, was not the prevailing factor or primary cause of Jennings' hip fracture. Although Dr. Do's opinions were challenged on cross-examination, the record reveals that he gave reasonable responses based on his expertise

19

as a board-certified orthopedic surgeon that the prevailing or primary cause of Jennings' hip fracture was the long-term use of steroids taken to treat his sarcoidosis.

Consequently, based on our review of the entire record, we do not find that "the Board's decision has been so undermined by cross-examination or other evidence that a reasonable person would not accept it as support of the Board's factual findings." *Wimp v. American Highway Technology*, 51 Kan. App. 2d 1073, 1076, 360 P.3d 1100 (2015). Rather, we find that there is substantial competent evidence in the record to support the Board's findings of fact. Likewise, we find no error of law. Thus, we affirm the Board's decision that the work incident on March 22, 2015, was not the prevailing factor in causing the fracture to Jennings' femoral head.

*Finding of Temporary Injury*

Both Jennings and the Fund challenge the Board's finding of a temporary injury. Jennings primarily relies upon his previous argument that the work incident on March 22, 2015, was the prevailing factor in causing the fracture of his femoral head. However, the Fund suggests that the Board should not have reached the issue of a temporary injury because "the Board identified the critical question as 'whether claimant fractured his left femoral head on March 22, 2015, when he rolled over and attempted to sit up.'"

An award under the Workers Compensation Act depends on the nature of the claimant's impairment. See *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 522, 154 P.3d 494 (2007). Here, the Board found that the work incident was not the prevailing cause of the fracture to Jennings' femoral head. Nevertheless, the Board modified the ALJ's award by finding that Jennings "sustained a left hip injury on March 22, 2015, arising out of and in the course of his employment, but that said hip injury was temporary in nature." As a result, the Board awarded Jennings $400 in unauthorized medical expenses.

In light of our review of the entire record, we find that there is substantial evidence to support the Board's finding that Jennings suffered a temporary injury on March 22, 2015. In particular, there is evidence that Jennings heard a pop when he turned over in the ditch and felt pain. He was taken to the emergency room and reported that he could not bear weight on his left leg. Although an x-ray of Jennings' hip did not show any abnormality, he was given a shot of Toradol for pain and a steroid injection to help reduce the swelling. As noted above, he was instructed to see an orthopedic surgeon if his hip pain persisted, but he did not seek medical attention for hip pain again until nearly 10 months later. Thus, the Board did not err in finding that Jennings suffered from a temporary injury.

Affirmed.