NOT DESIGNATED FOR PUBLICATION

No. 128,693

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SERGIO MARTINEZ,
*Appellee*,

v.

HAVERKAMP BROTHERS, INC.,
and REDWOOD FIRE AND CASUALTY INSURANCE COMPANY,
*Appellants*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Oral argument held November 18, 2025. Opinion filed January 16, 2026. Affirmed in part and remanded with directions.

*Brent Jepson*, of Evans & Dixon, LLC, of Kansas City, Missouri, for appellant.

*Jeff K. Cooper*, of Cooper Law Office, of Topeka, for appellee.

Before GARDNER, P.J., HILL and JOAN LOWDON, District Judge, assigned.

PER CURIAM: Haverkamp Brothers Inc. (Haverkamp) and Redwood Fire and Casualty Insurance Company (collectively, Appellants) appeal a workers compensation award granted to Sergio Martinez. Appellants contend that three findings made by the Kansas Workers Compensation Appeals Board are unsupported: the amount of wage loss, the amount of task loss, and Martinez' entitlement to future medical compensation. Finding error in the task loss, we remand the case on that issue for reconsideration and affirm the other findings.

1

FACTS

*Broad Overview of the Underlying Facts and Disposition of this Case*

Sergio Martinez, a 56-year-old man, worked for Haverkamp, a hog farm, for around 13 years. He worked primarily as a breeding technician but after being injured at work in 2015, he was assigned an accommodated position, performing in-office duties such as data entry and cleaning. Before this employment, Martinez completed six years of school in Mexico. He does not speak or read English.

In June 2021, Martinez filed an application against Haverkamp and Appellants for workers compensation based on a back injury that he sustained from an accident at work on November 23, 2020. During that incident, Martinez fell down a flight of stairs while cleaning but landed on his feet. He continued to work for Haverkamp until it terminated his employment in October 2021.

The parties did not present witnesses at the initial administrative hearing on Martinez' claim, but they presented deposition testimonies and other evidence. The Administrative Law Judge (ALJ) decided Martinez' claim based on deposition transcripts, stipulations, reports, and workers compensation records. Martinez gave his deposition testimony over two days with a translator's assistance. He requested total disability and future medical compensation. The ALJ denied those requests but awarded Martinez partial disability compensation based on a 20.2% work disability.

Martinez appealed that decision to the Kansas Workers Compensation Appeals Board (the Board). The Board reversed the ALJ's denial of future medical compensation and modified the award for disability compensation to a 55.5% disability rating.

On appeal from the Board's decision, Appellants now challenge both the disability compensation and future medical compensation findings made by the Board. Appellants argue that the Board ignored or improperly considered evidence related to Martinez' 2015 work injury in deciding Martinez' request for compensation related to his 2020 injury. Appellants also claim that Martinez was terminated for cause so is entitled to no benefit, and that Martinez failed to prove a need for future medical treatment. The parties dispute some of the relevant facts, so an in-depth review of the evidence presented throughout the administrative proceedings is necessary to decide the issues that Appellants raise here.

*Overview of All Martinez' Work Injuries at Haverkamp*

Before Martinez' injury in November 2020, Martinez was injured while working with hogs on at least two other occasions in 2011 and 2015. The 2011 incident resulted in injuries to Martinez' right knee, and the 2015 incident resulted in injuries to Martinez' left hip and left knee.

Martinez received surgical and other medical care after each of these work injuries. Martinez was also placed on permanent work restrictions after his 2015 injury. Thus when Martinez fell down the stairs in November 2020, he was not performing his typical job duties as a breeding technician. He had been transferred to a primarily office position to do data entry and cleaning and was performing cleaning duties in the office when his 2020 injury occurred.

*Details Surrounding 2015 Injury and Related Work Restrictions*

Martinez' 2015 injury occurred when a 400-pound hog fell on him during artificial insemination. He was treated by an orthopedic surgeon, Scott Mullen, who performed surgeries on Martinez' knee and hip. Mullen gave Martinez impairment ratings under the Fourth Edition of the American Medical Association Guides to the Evaluations of

Permanent Impairment (4th ed. 1995) and Sixth Edition (6th ed. 2008). Combining these ratings, Mullen determined that Martinez had a 3% whole person impairment and a 7% partial impairment to his left lower extremities.

Martinez' position as a breeding technician typically required a 10-hour workday, working primarily outside or in a barn. Based on the extent of Martinez' injury, Mullen recommended permanent work restrictions at a medium demand category for an 8-hour workday. Summarized, these restrictions prevented Martinez from crawling, kneeling, or climbing ladders. Mullen also gave Martinez several limits on squatting, lifting, and other activities. Martinez' specific lifting restrictions limited floor to knuckle lifts to 30 pounds, knuckle to shoulder lifts to 35 pounds, and shoulder to overhead lifts to 25 pounds.

Martinez continued to have pain after his surgeries on his knee and hip, which caused him difficulty with walking, standing, and using stairs so he underwent an independent medical evaluation from Dr. Pedro A. Murati, in July 2020 for reported knee, hip, and back pain and a loss of balance. Murati diagnosed Martinez with a low back sprain due to "antalgia." He reviewed Martinez' impairment rating and concluded that Martinez had an 8% whole-body impairment. Murati also recommended permanent work restrictions similar to the ones Mullen had given. Martinez filed a workers compensation claim after the 2015 accident, which the parties settled in July 2022.

Martinez did not return to work after his 2015 accident and subsequent Family and Medical Leave Act leave until December 2019. The parties gave conflicting testimony about Martinez' job duties and work restrictions when he first returned. Martinez stated that he initially returned to his prior duties as a breeding technician and worked without any restrictions. Yet he acknowledged that sometime before his 2020 injury, he switched from working his breeding technician duties to the office cleaning position. He conceded that he was put on light duty restrictions after he returned to work in 2019, but claimed that this was because of the COVID-19 pandemic, not his injuries. Still, he agreed that he

4

eventually resumed his work as a breeding technician, but it is unclear whether this was before or after his 2020 injury.

Christine Keim, Haverkamp's human resources administrator and former workers compensation specialist, also provided deposition testimony about Martinez' employment. She denied Martinez' suggestion that Haverkamp had assigned him office duties because of the pandemic and testified to the contrary that Martinez had been assigned that position in December 2019 or January 2020 to accommodate his work restrictions. Keim acknowledged, however, that Martinez was not put on formal permanent work restrictions until July 2020. This was because when Martinez first returned to work, Haverkamp had requested clarification from Mullen about Martinez' restrictions and had put Martinez on informal temporary restrictions before that. For example, because Martinez had recently had surgeries on his knee and hip, he could not walk on uneven surfaces, so Haverkamp accommodated him with work that did not require him to be in the barn. Martinez also initially worked only four hours a day so he could attend physical therapy in the afternoons. Haverkamp complied with Martinez' formal work restrictions once they were clarified by Mullen in July 2020.

*Details Surrounding 2020 Injury, Medical Examinations, and Treatment*

On November 23, 2020, Martinez tripped down a flight of stairs while cleaning the office. He tripped down several stairs and landed on his left foot. This caused a jarring, "hot" sensation in Martinez' back, and pain in his right knee and left hip.

Martinez' primary care physician, William A. Bartkoski, treated Martinez for leg, hip, and back pain with prescription medications. But Bartkoski's medical records show that Martinez may have had back issues and knee and hip pain before his 2020 accident. Martinez saw Bartkoski three weeks before his 2020 accident for reported knee and hip pain. Bartkoski's notes of that examination stated his belief that Martinez' pain may have

5

stemmed from issues related to his back. Because Martinez was already taking certain prescription medications for his symptoms, Bartkoski recommended another medication, Neurontin, and chronic pain management.

On May 4, 2021, Martinez had an independent medical evaluation with Eden Wheeler, a physical medicine and rehabilitation specialist. During this examination, Martinez reported that he had constant low back pain and an electric shock sensation that ran through his lower back to both his legs after prolonged sitting and standing and after around 45 minutes of physical work. Martinez also reported numbness, tingling, and shakiness in his legs and ankles. He stated that the pain was exacerbated by lifting, sitting, bending, standing, walking, and climbing stairs. This pain also caused him difficulty sleeping.

Based on her examination and review of Martinez' medical records, Wheeler diagnosed Martinez with central low back, bilateral sacroiliac (SI) joint, and posterior buttock pain; chronic bilateral knee and left hip pain; bulging discs; and mild stenosis. Wheeler identified Martinez' 2020 accident as the prevailing cause of his "lumbar/left SI joint strain." She did not review his X-rays or the MRI scan, yet determined that his diagnostic tests showed degenerative changes *not* attributable to the 2020 incident. Still, Wheeler opined that the 2020 incident may have contributed to or solely caused Martinez' persistent central lumbar symptoms. Overall, Wheeler found the 2020 injury caused Martinez 3% impairment.

Wheeler also completed a task analysis and determined that Martinez did not suffer any task loss from the 2020 injury. Wheeler found that Martinez could not perform 1 of 14 tasks—he could not repair corral fencing and doors because that required lifting and carrying up to 100 pounds. But this was because of Martinez' preexisting work restrictions from his 2015 injury; Wheeler did not attribute that task loss to Martinez' 2020 injury.

Wheeler also concluded that Martinez did not require any restrictions not already imposed after his 2015 injury. Wheeler understood that Martinez was not doing any heavy lifting, climbing, or similar activities after his 2015 injury. Martinez had given her a written description of his job duties which listed several physical tasks, including maneuvering up to 50 pounds. But Martinez had also told her that he had been placed on permanent restrictions after his 2015 injury. Martinez "cited his responsibilities at least since the pandemic [as] disinfecting high touch areas and doing computer/data entry for 3-4 hours."

As for treatment, Wheeler recommended left SI joint injections for pain management. Martinez received two injections and reported 10% relief after the first injection but no relief after the second injection. Wheeler found no basis for recommending "intervention to [Martinez'] right SI joint or other pain management procedures for [his] central complaints." Nor did she recommend any additional treatments for Martinez' chronic hip pain, noting that although Martinez "experienced a limited exacerbation of his pre-existing chronic left hip pain, . . . this . . . returned to baseline with no need for further evaluation or treatment."

At Martinez' request, Murati performed another examination on August 18, 2021. He diagnosed Martinez with lumbar radiculopathy, right SI joint dysfunction, and preexisting left SI joint dysfunction. Murati concluded that the 2020 accident caused the lumbar radiculopathy and right SI joint dysfunction. For treatment, Murati recommended bilateral lower extremity electromyography and nerve conduction studies, physical therapy, anti-inflammatory medications, and lumbar epidural steroid injections.

*Additional Medical Examinations*

The ALJ issued orders in October 2021 and December 2022 for additional medical examinations by neutral physicians under K.S.A. 44-516. The ALJ appointed Dr. Robert Gardiner for the first examination and Dr. Lowry Jones for the second examination.

Gardiner determined that Martinez' X-rays showed degenerative joint disease, particularly at his L4-L5 and L5-S1 spinal segments. Gardiner opined that Martinez' 2020 injury exacerbated his preexisting degenerative joint disease in his spine. Gardiner also found Martinez had exhausted all conservative treatment for this issue but could benefit from surgery, so Gardiner recommended a referral to a spine surgeon.

Before Martinez was examined by Jones, he met with a neurosurgeon, Harold Hess, at his attorney's request. Based on his review of Martinez' medical records, injury history, and MRI scan, Hess noted that Martinez sustained a "new injury" from the 2020 accident. He assigned Martinez a 12% whole person impairment rating and recommended that Martinez undergo a series of lumbar epidurals. If Martinez showed no improvement from the epidural injections, Hess believed that Martinez would need surgery—a laminectomy and discectomy.

As for work restrictions, Hess concluded that Martinez should not lift more than 10 pounds until he received definitive treatment for his lower back. He also recommended restrictions from frequent bending, twisting, and crawling. Hess reviewed a list of Martinez' job tasks and determined that Martinez could not perform any of the 12 tasks listed. But unlike Wheeler, Hess did not consider Martinez' permanent work restrictions from his 2015 injury in his task assessment.

Jones examined Martinez in April 2023. Similar to Hess, he concluded that Martinez had sustained a new injury to his lumbar spine from the 2020 accident.

Martinez had "an acute injury to the annular disc at L4-5 with disc bulging that is distinctly different than his other disc" and did not have "chronically degenerative disc changes." But he found that Martinez' pain in his lower extremities, hip, and left knee stemmed from a preexisting and unrelated injury. Jones issued a 3% whole person impairment rating and a 5% functional impairment rating. He recommended permanent restrictions from repetitive bending and lifting and limited Martinez' lifting to 30 pounds for items below his knee and 50 pounds for items above his waist.

Jones did not offer an opinion about Martinez' task loss. As for treatment, Jones found no basis for any "significant recommendations . . . other than continued independent exercises" and continued use of his prescription medications. He determined that Martinez was not a surgical candidate.

*Vocational Evaluations*

In September 2023, Martinez met with a vocational expert, Richard Thomas. Thomas noted that Martinez was 55 years old, lived in a very small community, did not speak or write English, and had a 6th grade education in Mexico. Martinez had been employed as a farm laborer, working with hogs his entire work life. Martinez had chronic pain, difficulty sleeping, and problems putting on socks and shoes without assistance. Martinez could not comfortably sit, stand, or drive for more than 30 minutes or walk more than two blocks. Thomas determined that Martinez was not employable in the open labor market.

Thomas testified that after Martinez' 2015 injury, Haverkamp accommodated him with light-duty job tasks and paid him 90% of his regular earnings, so Martinez was not eligible for work disability at that time. Thomas believed that Haverkamp's previous accommodations affected Martinez' employability before the 2020 accident, but Thomas did not assess what Martinez' earning capacity in the open labor market may have been

9

immediately after his 2015 injury. Still, Thomas concluded that after the 2020 incident, Martinez had a 0% wage earning capacity.

At Haverkamp's request, Martinez also attended a vocational consultation with Steven Benjamin. Benjamin noted that after Martinez' 2015 injury, he continued to work at his previous position at a gross weekly wage of $750.69. Martinez was still technically "able to earn that wage." Benjamin believed even after Martinez' 2020 injury, Martinez still had "work life and could re-enter the open labor market, but he'd have a wage loss of approximately 40.4%."

Benjamin provided alternative opinions about Martinez' wage loss based on the varying opinions provided by some of the physicians who had examined Martinez. Using Wheeler's recommendation that Martinez did not need any new restrictions based on his 2020 accident, Benjamin determined that Martinez had a 0% wage loss. But using Hess' recommendations—which effectively limited Martinez to a sedentary job—Martinez was not employable and thus had a 100% wage loss.

*Martinez' Return to Work After 2020 Injury and Subsequent Firing*

Keim testified that when Martinez returned to work after his 2020 injury, he worked under the same permanent restrictions put in place in July 2020. Martinez worked in that capacity until October 2021, when Haverkamp terminated his employment.

According to Keim, Haverkamp fired Martinez because he no longer wanted to perform any duties as a breeding technician. She explained that in late summer 2021, Martinez asked to be removed from all tasks related to breeding and moving sows. But these tasks made up about half of Martinez' job responsibilities. Keim suggested that Martinez was physically capable of performing these tasks. She stated that breeding took about an hour each day and required one person to load a backpack with semen and

10

another person to do the insemination. To do that process, employees walked into a barn stall, cleaned the sow, and inserted an insemination rod into her before moving on to the next stall to repeat the process. The breeding barn had an office where Martinez could sit for 5-10 minutes every hour.

Keim also testified that Martinez was fired because he sometimes left work early without permission. She also explained that typically a breeding technician worked 10-hour days but Martinez' work restrictions limited him to 8-hour days. Keim stated that Martinez had valuable experience and it was not an easy decision to fire him. But Haverkamp could not honor Martinez' request to stop breeding and moving sows.

Martinez admitted that he sometimes left work early but denied that he did so without permission. He testified that he had been told to leave work early on days that he was in pain. Martinez testified that the company had told him that he was fired because they needed someone who was "100 percent able to do [his] job."

*Post-Firing Job Search and Applications for Compensation*

Martinez then unsuccessfully applied for work with Alphia, Orscheln Farm & Home, and Family Dollar. Martinez did not look for other positions after these rejections and has not worked since being terminated from his employment at Haverkamp.

*ALJ Award*

Martinez filed for workers compensation based on his 2020 injury, requesting permanent total disability compensation and future medical compensation. As noted in the ALJ's July 2024 decision, the parties made several factual stipulations for the ALJ's consideration, some of which included:

- Martinez was personally injured by an accident on November 23, 2020;

- The injury arose in the course of Martinez' employment;

- The 2020 accident was the prevailing factor that caused Martinez' injuries, need for treatment, and resulting impairment or disability;

- Martinez' average weekly wage on the date of accident was $750.69; and

- Haverkamp paid Martinez several payments of temporary total disability and temporary partial disability compensation in the sum of $2,502.45 and $2,760.21 and $5,929.74 in medical compensation.

The ALJ denied Martinez' request for permanent total disability compensation but awarded partial disability compensation. The ALJ noted that Martinez was not entitled to any compensation unless his whole-body impairment was more than 7.5%. And if Martinez had any preexisting impairment, his rating would have to exceed 10%. The ALJ adopted Jones' opinion that Martinez suffered 5% impairment from the 2020 accident. The ALJ noted that because the parties settled Martinez' 2015 workers compensation claim, there was no formal finding about his functional impairment from that injury. But balancing Mullen's and Murati's opinions on the matter, the ALJ found that Martinez had a 6% preexisting functional impairment. So Martinez had a combined impairment rating of 11%, thus meeting the 10% threshold for compensation under K.S.A. 44-510e(a)(2).

As for the amount of compensation, the ALJ adopted Wheeler's opinion that Martinez failed to show any task loss. The ALJ noted that Hess failed to consider Martinez' preexisting work restriction from his 2015 injury in his task loss assessment. But Wheeler made the necessary considerations and concluded that Martinez suffered 0% task loss. The ALJ relied on Benjamin's opinion for calculating Martinez' wage loss and found that he suffered a 40.4% loss. After averaging these percentages, the ALJ awarded Martinez compensation for his 20.2% work disability.

The ALJ denied Martinez' request for future medical compensation, applying the presumption under K.S.A. 2020 Supp. 44-510h that an employer's obligation to an injured employee terminates when the employee reaches maximum medical improvement. The ALJ noted that Hess was the only physician who recommended future medical care. And Martinez had not met his burden to show a need for additional medical treatment, so he failed to rebut the statutory presumption.

*The Board's Review and Award*

Martinez requested review from the Board, arguing he was intitled to an award based on a 100% task loss and 100% wage loss and future medical compensation. The Board agreed with the ALJ's findings that Martinez was not permanently totally disabled but was entitled to work disability compensation. But the Board modified the amount of compensation awarded, finding the ALJ improperly calculated Martinez' wage and task losses. Addressing Martinez' task loss, the Board noted the split in the opinions provided by Wheeler and Hess and averaged their assessments that Martinez' task loss was either 0% or 100%. The Board thus concluded that Martinez sustained a 50% task loss. The Board reasoned that it was "simply . . . not credible [that] . . . [Martinez] ha[d] no task loss, given he was let go from an accommodated job by an employer who considered him a good employee, with valuable experience." But Martinez was "performing an accommodated job" that was "arguably within his permanent restrictions," so the evidence did not support a 100% task loss.

As for Martinez' wage loss, the Board rejected the opinions that Martinez suffered either a 0% or 100% wage loss as lacking credibility. Relying on Benjamin's opinion, the Board found that Martinez could still earn a wage in the open labor market but not in the "optimistic" amount of $447.20 that Benjamin used. The Board found the "greater weight of the evidence" instead showed that Martinez could expect to earn an entry-level wage. The Board noted that Kansas' minimum hourly wage was $7.25 and used that figure to

13

calculate Martinez' postinjury average weekly wage. And after finding the difference between Martinez' average weekly wage with Haverkamp and postinjury weekly wage, the Board found that Martinez suffered a 61% wage loss. Combining Martinez' 61% wage loss and 50% task loss, the Board determined that Martinez was entitled to compensation for a 55.5% work disability. The Board thus ordered the ALJ to modify Martinez' award accordingly.

Finally, the Board determined that Martinez was entitled to future medical compensation. The Board found that Hess, Gardiner, and Jones provided more credible testimony on this matter than Wheeler. Hess specifically recommended future medical compensation for epidurals and surgical treatments. Gardiner similarly recommended that Martinez be referred to a spine specialist to explore possible surgical options. Jones did not recommend future medical compensation but did recommend that Martinez continue taking prescription medications and undergo additional evaluations to determine his limitations. Based on these recommendations, the Board found it more probably true than not that Martinez needed additional medical treatment. Martinez thus rebutted the presumption under K.S.A. 44-510h and established his entitlement to future medical compensation.

ANALYSIS

*Did the Board Err by Finding Martinez Incurred a 61% Wage Loss?*

Appellants first contend that substantial evidence does not support the Board's calculation of Martinez' wage loss. Contrary to the Board's decision, Appellants assert that Martinez was terminated for cause and that the restrictions related to his 2015 work injury contributed to his wage loss, so the Board erred by attributing its entire wage loss to Martinez' 2020 injury. Appellants also assert that Martinez refused to continue working for Haverkamp in his accommodated position, so the panel should have applied

the rebuttable presumption in K.S.A. 2020 Supp. 44-510e(a)(2)(E)(iii). Under that presumption, Martinez was capable of earning a postinjury average weekly wage equal to the one that he earned working for Haverkamp, so he suffered no wage loss from his 2020 injury.

*Standard of Review and Basic Legal Principles*

The Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., governs this court's review of cases arising under the Workers Compensation Act, K.S.A. 44-501 et seq. K.S.A. 44-556(a). The standard of review varies depending on the issue raised. See K.S.A. 77-621 (defining and limiting scope of review of administrative decisions under KJRA). The KJRA sets forth several grounds on which an appellate court may grant relief. See K.S.A. 77-621(c)(1)-(8). K.S.A. 77-621(c)(4) provides a basis for granting relief from an agency decision when "the agency has erroneously interpreted or applied the law." K.S.A. 77-621(c)(7) also allows for relief where "the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole."

When determining fact questions, an appellate court's responsibility is to review the record as a whole to determine whether the Board's factual determinations are supported by substantial evidence. "Substantial evidence" refers to "'"evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis [of fact] from which the issue raised could be easily resolved."' [Citation omitted.]" *Rogers v. ALT-A&M JV*, 52 Kan. App. 2d 213, 216, 364 P.3d 1206 (2015). "This analysis requires the court to (1) review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility determination, if any; and (3) review the agency's explanation as to why the

evidence supports its findings." *Williams v. Petromark Drilling, LLC*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

In reviewing the evidence in light of the record as a whole, this court shall not reweigh the evidence or engage in de novo review. K.S.A. 77-621(d); *Williams*, 299 Kan. at 795. Yet statutory interpretation presents a question of law. So to the extent that statutory interpretation is required to decide Appellants' claims, this court exercises an unlimited review. *EagleMed, LLC v. Travelers Insurance*, 315 Kan. 411, 420, 509 P.3d 471 (2022).

*For-Cause Termination Not Shown*

K.S.A. 44-510e provides for the determination of weekly compensation for employees suffering from temporary or permanent partial general disability. Even so, K.S.A. 44-510e(a)(2)(E)(i) states that "[w]age loss caused by . . .  termination for cause shall in no way be construed to be caused by the injury." Thus an employer is generally not required to compensate a disabled employee for wage loss that results from the employee's termination for cause. See *Dirshe v. Cargill Meat Solutions Corp.*, 53 Kan. App. 2d 118, 122, 382 P.3d 484 (2016).

The Kansas Workers Compensation Act does not define the term "for cause," but this court has recognized that "cause" in this context refers to a "'shortcoming in performance'" that is detrimental to the employer's discipline or efficiency. *Hernandez v. National Beef Packing Company*, No. 117,351, 2017 WL 4081392, at *3 (Kan. App. 2017) (unpublished opinion) (quoting *Weir v. Anaconda Co.*, 773 F.2d 1073, 1080 [10th Cir. 1985]). "'[I]ncompetency or inefficiency or some other cause within the control of the employee which prohibits him from properly completing his task is also included within the definition. A discharge for cause is one which is not arbitrary or capricious, nor is it unjustified or discriminatory.'" 2017 WL 4081392, at *3 (quoting *Weir*, 773 F.2d

at 1080). In the unemployment compensation context, "leaving work prior to the end of such individual's assigned work period without permission shall be considered prima facie evidence of a violation of a duty or obligation reasonably owed the employer as a condition of employment." K.S.A. 44-706(b)(2)(A).

This court has also explained that the proper inquiry is "whether the termination was reasonable, given all of the circumstances." *Morales-Chavarin v. National Beef Packing Co.*, No. 95,261, 2006 WL 2265205, at *5 (Kan. App. 2006) (unpublished opinion). Part of the consideration is whether the claimant made a good-faith effort to maintain his or her employment and whether the employer exercised good faith in terminating the employee. 2006 WL 2265205, at *5; *Oliver v. National Beef Packing Co.*, No. 123,601, 2021 WL 5984170, at *6 (Kan. App. 2021) (unpublished opinion). The primary focus when considering the employer's good faith is determining "whether the employer's reason for termination is actually a subterfuge to avoid work disability payments." *Morales-Chavarin*, 2006 WL 2265205, at *5.

The Board did not explain its reasoning for rejecting Appellants' argument that it terminated Martinez for cause. It neither found that Martinez acted in good faith nor that Haverkamp acted in bad faith. It simply found the record "absent of any evidence [Martinez] was terminated for job abandonment or cause." In challenging this finding, Appellants claim that Martinez conceded in his deposition testimony that he was fired for cause. Appellants also argue that Keim's testimony established that Martinez was fired for cause.

But, to the contrary, our review of the record fails to show that Martinez conceded in his deposition that he had been fired for cause. During the first day of Martinez' deposition, Appellants' attorney questioned him about "the written termination" of his employment, which "indicate[d] that [Martinez] had been leaving early from work" and asked whether Martinez "recall[ed] that." Martinez responded, "Yeah. . . . I used to tell

17

them that I was in pain, so they told me I could leave." While cross-examining Martinez during the second day of Martinez' deposition, counsel suggested that Martinez had admitted in his previous testimony that he had been fired for leaving work early. Yet Martinez *denied* having made that admission and clarified that Haverkamp had told him that they were firing him because they wanted someone who could perform 100% of his original job tasks. Thus the record fails to show that Martinez admitted that he was terminated for cause.

Keim's testimony comes much closer to establishing that Martinez was fired for cause. She testified that Martinez sometimes left work early without permission and that Haverkamp considered this factor in deciding to fire Martinez. Haverkamp spoke to Martinez about this but never wrote him up for it. Martinez had no other disciplinary history. Nothing shows that Haverkamp gave Martinez notice that leaving work early would result in discharge. Martinez identified pain as his reason for leaving early. Still, one could read Keim's testimony as implying that Martinez was fired for cause. We agree the Board's finding that the record had no evidence that Martinez was terminated for cause was an overstatement, yet we review the record for substantial evidence supporting the Board's conclusion that Martinez was not terminated for cause.

Keim also testified that Martinez was "let go because [Haverkamp] did not feel [it] could accommodate . . . having him not move . . . or breed [sows]." Keim clarified that Martinez returned to his normal duties as a breeding technician sometime after his 2020 injury. Keim indicated that Martinez was capable of performing these duties under his permanent work restrictions. She summarized his permanent work restrictions, which Keim maintained had not changed since they were first imposed in July 2020:

> "[Martinez] was restricted to going from a ten-hour day to an eight-hour day; no crawling
> or kneeling or infrequent squatting; no climbing ladders; he could on occasion lift or
> carry 35 pounds; he could lift or carry frequently 15 pounds; he could lift or carry

18

constantly 7 pounds; he could push or pull occasionally 100 pounds; push, pull frequently 50 pounds; push, pull constantly 20 pounds; floor to knuckle lift was 30 pounds; knuckle to shoulder lift, 35 pounds; shoulder to overhead lift, 25 pounds; two-hand carry, 35 pounds; and he was allowed to sit for five to ten minutes per hour."

Keim agreed that two months before Martinez' termination, he asked to be removed from his duties of breeding and moving sows, claiming they caused pain.

Appellants argue that the Board should have given greater weight to Keim's testimony and suggest that this court may reweigh that evidence on appeal. But that is not a task within the scope of this court's review of the Board's decision. See *Williams*, 299 Kan. at 795. The Board did consider both Keim's and Martinez' testimonies, noting Appellants' claim that Martinez sometimes left work early and Martinez' denial that he lacked permission to do so. The Board also weighed the evidence and considered the parties' credibility on this matter, as was its duty. See *Wimp v. American Highway Technology*, 51 Kan. App. 2d 1073, 1103, 360 P.3d 1100 (2015) ("The Board, not our court, makes the factual findings, so we do not weigh conflicting evidence except to determine whether the evidence supporting the Board's decision has been so undermined by . . . other evidence that a reasonable person would not accept it as support of the Board's factual findings."). Although the Board could have placed more weight on Keim's testimony, we cannot. The record thus shows substantial evidence that Martinez was not terminated for cause.

*Substantial Support for the Board's 61% Wage Loss Determination*

Appellants next claim that the Board's wage loss determination was not supported by substantial evidence because the Board adopted Thomas' assessment, and Thomas failed to consider the necessary factors in K.S.A. 2020 Supp. 44-510e(a)(2)(E). Because Thomas failed to consider whether Martinez' 2015 injury contributed to his wage loss, the

19

Board erred as a matter of law by relying on Thomas' testimony. According to Appellants, Benjamin provided the only reliable and legally sufficient testimony on this issue, so the Board should have adopted his opinion that Martinez' 2020 injury did not cause any wage loss.

We are not persuaded. A claimant's permanent partial disability compensation is calculated by averaging the employee's postinjury task loss and wage loss. See K.S.A. 44-510e(a)(2)(C). An employee's "wage loss" is the difference between the average weekly wage that the employee earned when the injury occurred and the average weekly wage the employee is able to earn after the injury. K.S.A. 44-510e(a)(2)(E). Appellants correctly argue that several factors must be considered when determining the employee's postinjury average weekly wage. These factors include but are not limited to the worker's "age, physical capabilities, education and training, prior experience, and availability of jobs in the open labor market." K.S.A. 44-510e(a)(2)(E). But Thomas testified that he considered Martinez' age, physical capability, education and training, experience, the availability of jobs, and several other factors in his analysis.

Appellants mischaracterize the Board's findings about Martinez' wage loss. Contrary to Appellants' argument, the Board did not simply adopt Thomas' opinion and reject Benjamin's. The Board found Thomas' opinion that Martinez suffered 100% wage loss and Benjamin's opinion that Martinez suffered 0% wage loss *both* lacked credibility. Benjamin testified that Martinez maintained some capacity to earn a wage after his 2020 injury, and the Board agreed. Still, the Board rejected Benjamin's testimony that Martinez could earn a wage in the open labor market at an average weekly rate of $447.20 as overly optimistic. Instead, finding the "greater weight of the evidence" showed that Martinez could more likely expect to earn an entry-level wage, the Board relied on Kansas' minimum hourly wage to calculate Martinez' average weekly wage as $290. And taking the difference between Martinez' average weekly wage during his employment

20

with Haverkamp of $750.69 when the 2020 injury occurred and his $290 postinjury average weekly wage, the Board determined that Martinez suffered a 61% wage loss.

This conclusion is supported by substantial evidence. The Board relied primarily on Benjamin's testimony in finding Martinez capable of earning a postinjury wage. And as Appellants concede, Benjamin considered the factors provided in K.S.A. 2020 Supp. 44-510e(a)(2)(E) in his assessment. Appellants challenge the Board's use of minimum wage in its calculation, but the Board's rejection of the higher wage Benjamin used was reasonable under the circumstances, given Martinez' physical limitations and other issues affecting his employability. Similarly, the Board's use of the State's minimum wage law, when acting in its quasi-judicial capacity, was an appropriate exercise of judicial notice. See K.S.A. 60-409(b) ("Judicial notice may be taken without request by a party, of . . . private acts and resolutions of . . . the legislature of this state."); *Roberts v. J.C. Penney Co.*, 263 Kan. 270, 277-78, 949 P.2d 613 (1997) (ALJ and Board not strictly bound by rules of evidence); K.S.A. 44-523(a) (ALJ and Board "not . . . bound by technical rules of procedure").

Nor did the Board reversibly err by averaging Thomas' and Benjamin's opinions to determine Martinez' wage loss. See *Rodriguez v. IBP, Inc.*, No. 85,679, 2001 WL 37132351, at *1-2 (Kan. App. 2001) (unpublished opinion) (finding no error in Board's decision to average three physicians' opinions to determine claimant's functional impairment); *Willming v. Atchison Hospital*, No. 125,102, 2023 WL 1879322, at *4 (Kan. App. 2023) (unpublished opinion) (applying *Rodriguez* and finding no error in averaging expert opinions to determine claimant's wage loss).

*Presumption Under K.S.A. 44-510e(a)(2)(E)(iii)*

Appellants also claim that the Board failed to attribute any loss to Martinez' 2015 injury. But appellants cite only K.S.A. 44-510e(a)(2)(E) as support for this claim,

21

asserting that the Board erred by failing to apply the presumption under K.S.A. 44-510e(a)(2)(E)(iii). This subsection imposes a rebuttable presumption of no wage loss when an injured worker refuses "accommodated employment within the worker's medical restrictions as established by the authorized treating physician and at a wage equal to 90% or more of the pre-injury average weekly wage." K.S.A. 44-510e(a)(2)(E)(iii).

Appellants claim that Martinez' request to stop breeding and moving sows, which was about half of Martinez' work duties, was a refusal of accommodated employment and met all requirements of K.S.A. 44-510e(a)(2)(E)(iii). But the Board did not make any findings on this matter because Appellants never presented this argument to the ALJ or the Board. This issue is improperly raised for the first time on appeal, see *In re A.S.*, 319 Kan. 396, 399-400, 555 P.3d 732 (2024), and this court cannot make the factual determinations necessary to resolve it. We thus find no error in the Board not applying the presumption under K.S.A. 44-510e(a)(2)(E)(iii). Substantial evidence thus supports the Board's 61% wage loss determination.

*Did the Board Err by Finding Martinez Suffered a 50% Task Loss?*

Appellants next claim that the record lacks evidence supporting the Board's finding that Martinez' 2020 injury resulted in a 50% task loss. The Board calculated this result by averaging Wheeler's opinion that Martinez' task loss was 0% and Hess' opinion that it was 100%. Appellants contend that the Board relied on Hess' opinion in its task loss calculation, but Hess failed to consider Martinez' preexisting permanent work restrictions in his assessment, as K.S.A. 44-510e(a)(2)(D) requires. We agree.

*Applicable Legal Rules*

This issue challenges the Board's factual findings, so we review for substantial evidence, as outlined above. See *Rogers*, 52 Kan. App. 2d at 216. In doing so, we review

22

the record as a whole without reweighing the evidence. See K.S.A. 77-621(c)(7); K.S.A. 77-621(d); *Williams*, 299 Kan. at 795.

"Task loss" under K.S.A. 44-510e(a)(2)(D) is "the percentage to which the employee, in the opinion of a licensed physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the five-year period preceding the injury." A work task is determined to be lost when "permanent restrictions imposed by a licensed physician as a result of the work injury" prevent the employee's ability to perform the task. K.S.A. 2020 Supp. 44-510e(a)(2)(D). Here, the tasks lost must result from Martinez' 2020 work injury.

When, as here, the employee has preexisting permanent restrictions, those restrictions must be considered in this analysis, as K.S.A. 44-510e(a)(2)(D) requires:

> "The permanent restrictions imposed by a licensed physician as a result of the work injury shall be used to determine those work tasks which the employee has lost the ability to perform. If the employee has preexisting permanent restrictions, any work tasks which the employee would have been deemed to have lost the ability to perform, had a task loss analysis been completed prior to the injury at issue, shall be excluded for the purposes of calculating the task loss which is directly attributable to the current injury."

In determining task loss, the Board, as the factfinder, "has the right and the obligation to weigh the evidence and determine the credibility of witnesses, including the physicians who testified, and utilize that as a factor in making its decisions." *Tovar v. IBP, Inc.*, 15 Kan. App. 2d 782, 785, 817 P.2d 212 (1991). The Board is often required to make this determination based on conflicting evidence. So the Board may "decide which testimony is more accurate and/or credible, and . . . adjust the medical testimony along with the testimony of the claimant and any other testimony which may be relevant to the question of disability." 15 Kan. App. 2d at 786.

23

*The Board's Task Loss Determination Lacks Sufficient Support*

This court has upheld decisions when, as here, the Board essentially averages medical testimony about a claimant's impairment. See, e.g., *Willming*, 2023 WL 1879322, at *4 (finding no error in the Board's averaging of conflicting expert opinions to determine claimant's wage loss); *Rodriguez*, 2001 WL 37132351, at *1-2 (finding no error in decision to average three physicians' opinions to determine claimant's functional impairment); *Tovar*, 15 Kan. App. 2d at 785-86 (upholding decision which essentially averaged medical testimony about claimant's impairment). Thus, averaging is not per se prohibited. Still, the Board's ultimate conclusion must be supported by substantial evidence. See K.S.A. 77-621(c)(7); *Tovar*, 15 Kan. App. 2d at 786. Yet this record lacks sufficient evidence to support the Board's conclusion.

The parties presented testimonies from two licensed physicians, Wheeler and Hess, to support their respective arguments on task loss. Wheeler opined that Martinez' task loss was 0% and Hess opined that it was 100%. The Board considered both opinions but did not adopt either proposed percentage as the task loss Martinez incurred from his 2020 injury. The Board instead averaged the conflicting opinions and imputed a task loss of 50%. In doing this, the Board relied partly on Hess' assessment. Martinez contends that Hess is credible and Wheeler is not, and this is substantial evidence supporting the Board's conclusion. Yet we do not reweigh credibility on appeal. *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 514-15, 154 P.3d 494 (2007).

And as Appellants convincingly argue, Hess' assessment was flawed. He admitted that he did not know about, and thus did not consider, Martinez' preexisting permanent restrictions in his task loss assessment. Because Hess did not exclude any task loss attributable to Martinez' preexisting restrictions, which were substantial, he did not accurately calculate the task loss that resulted from Martinez' 2020 injury. See K.S.A. 44-510e(a)(2)(D).

24

The record lacks evidence that could induce a reasonable factfinder to conclude that Martinez' 2020 injury resulted in a 50% task loss. Hess was the only physician that found Martinez suffered any task loss, and he failed to consider Martinez' preexisting permanent restrictions. Wheeler considered the necessary factors but found no task loss. Wheeler found that Martinez did not need any new restrictions after his 2020 injury because his preexisting restrictions appropriately accommodated all Martinez' injuries. True, Wheeler's task analysis found that Martinez was not capable of committing one of 14 tasks, but Martinez was unable to complete that task under his preexisting restrictions, so Wheeler properly excluded that loss from her assessment of the task loss resulting from Martinez' 2020 injury.

Martinez tacitly agrees that Hess failed to consider his preexisting permanent restrictions but contends that Hess did not need to consider them because they were not "realistically in effect" when he was injured in 2020. As support, he alleges that he had returned to his position as a breeding technician and had worked for several months without restrictions by the time the 2020 accident occurred.

But the details are unclear about the similarities or differences in Martinez' postinjury and preexisting permanent restrictions, about what jobs he performed after his 2015 injury, and whether his duties were within or outside the permanent restrictions. Martinez claims that he worked for several months without restrictions after his 2015 injury but tacitly alleges that he was assigned additional restrictions based on his 2020 injury. The record is unclear as to whether Martinez performed his normal work duties with no restrictions or other accommodations for any amount of time. The parties seemingly agree that Martinez worked in an accommodated position for a period of time and worked under permanent restrictions since July 2020. The record is similarly unclear. But the lack of clarity cuts against the Board's task loss finding.

25

Based on a review of the record as a whole, we find the Board's task loss determination is not supported by substantial evidence. We thus remand the case on this issue to the Board for reconsideration. Cf. *Eder v. Hendrick Toyota*, No. 114,824, 2016 WL 7324454, at *13 (2016) (unpublished opinion) (finding error based on Board's failure to exclude task loss attributable to preexisting permanent restrictions and remanding issue to Board for reconsideration).

*Did the Board Err by Awarding Martinez Future Medical Compensation?*

Finally, Appellants contend that the Board erred by finding that Martinez was entitled to future medical compensation. Appellants argue that Martinez failed to prove that he will need future medical treatment for his 2020 injury, so he did not rebut the presumption in K.S.A. 44-510h(e) that Haverkamp's obligation to provide for future medical treatment had terminated. In support, Appellants assert that Wheeler's and Jones' opinions that Martinez was not a surgical candidate refute Gardiner's and Hess' opinions to the contrary.

K.S.A.44-510h(a) states that an employer generally has a duty to provide future medical treatment for an injured employee as may be reasonably necessary to cure or relieve the effects of the work-related injury. But other statutory provisions show that this obligation to the employee is not perpetual. For example, K.S.A. 44-510h(e) provides a statutory presumption that the employer's obligation to provide for future medical treatment terminates when the employee reaches maximum medical improvement. This is a rebuttable presumption that a claimant may overcome by proving that "it is more probable than not that future medical treatment . . . will be required as a result of the work-related injury." K.S.A. 44-525(a).

Our review of the record shows the Board's decision to award Martinez future medical compensation is supported by sufficient evidence. Martinez testified that he has

26

continuously had constant back pain since his 2020 injury. This pain has had widespread effects on Martinez' daily activities, including when he bends down, sits or stands for an extended time, walks, drives, sleeps, etc. Hess recommended that Martinez receive epidurals and seek surgical treatment to address this pain. Gardiner suggested that Martinez be referred to a spine surgeon. And Jones recommended continued use of prescription medications and additional examinations.

Appellants emphasize that Wheeler and Jones concluded that Martinez was not a surgical candidate. But the Board expressly found Hess' and Gardiner's opinions to the contrary more credible than Wheeler's on this matter, and this court does not reweigh the evidence or evaluate witness credibility. *Casco*, 283 Kan. at 514-15. Moreover, the record supports the Board's decision regardless of these conflicting medical opinions. We thus affirm the Board's award of future medical expenses.

Affirmed as to wage loss and future medical compensation. Remanded for redetermination of task loss.

Affirmed in part and remanded with directions.